Ruby HART, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–90–250–CR.

Court of Appeals of Texas, Corpus Christi.

Aug. 29, 1991.

W.J. Sames, Corpus Christi, for appellant.

Grant Jones, Dist. Atty., James D. Rosenkild, Asst. Dist. Atty., Corpus Christi, for appellee.

Before NYE, C.J., and KENNEDY and SEERDEN, JJ.

## OPINION

NYE, Chief Justice.

A trial court found appellant Ruby Hart guilty of felony injury to a child and as-

sessed punishment as twenty years' confinement in the Texas Department of Criminal Justice, Institutional Division. *See* Tex.Penal Code Ann. § 22.04(a) (Vernon Supp.1991). By ten points, appellant asserts error in the trial court's granting of the State's motions for continuance, in jury selection, in the admission of her written statement, general "unfair procedures," in the denial of her motion for directed verdict at the close of the State's case-in-chief, in a particular statement by the trial court, in the trial court's failure "to direct a verdict of acquittal," and generally to "an unfair entire proceeding." After due consideration of appellant's contentions, we affirm her conviction.

On June 30, 1989, the State indicted appellant for causing bodily injury to a child, a third degree felony, allegedly occurring on December 13, 1988. *See* Tex.Penal Code Ann. § 22.04(a)(4) (Vernon Supp. 1991). She was arrested on July 26, 1989. Appellant's counsel was appointed on August 28, 1989. On August 28, 1989, counsel recommended a $1,000 bond of which appellant need only pay ten percent to make bail.

Appellant remained in jail through the first trial setting, October 30, 1989, apparently because she was unable to meet the bail amount. On October 30th, the State announced that it was not ready for trial because her review of the case in preparation for trial led her to believe the case should be re-indicted as a first degree felony, allowing the State to allege "serious bodily injury" rather than mere "bodily injury." The prosecutor added that the State's witnesses were ready but, if the continuance were not granted and the trial proceeded, the State would dismiss the case, free appellant and then re-indict her for the more serious offense. Appellant's attorney indicated that he intended to depose all of the witnesses and have appellant examined to determine her sanity at the time of the offense. The trial court denied the State's oral motion for continuance and scheduled trial for the next day. That same day, the State tendered a written motion for continuance.

The next day, October 31, 1989, the trial court heard and granted the State a continuance and released appellant on bond. The trial court told appellant's counsel to consult his calendar and call the court manager to reset the trial date. The court also instructed appellant's counsel to schedule any necessary pre-trial hearings and to file any motions pertinent to those hearings at least ten days before the pre-trial hearing date. Appellant filed a motion to controvert the continuance and moved for dismissal on November 28, 1989. On November 30, 1989, the State re-indicted appellant, alleging that she caused serious bodily injury to a child, a first degree felony.

On January 11, 1990, at the hearing on appellant's motions, the court noted that it could not "ungrant" a continuance. The State argued that appellant did not show that the continuance prejudiced her except that she was re-indicted for a more serious offense. The court denied appellant's motion to dismiss and reset the trial for February 19, 1990. The court stated that any pre-trial motions, including any motion to suppress appellant's inculpatory statement, should be filed by January 25th, that the hearing date should be requested by January 26th, and the hearing set at least one week before trial. The court also specified that any motions in limine be filed by February 12, 1990.

On February 15, 1990, the State filed its second motion for continuance. On February 19, 1990, at the hearing for the continuance and several defense motions, including appellant's motion "for continued limine," the State asserted that a material witness, properly subpoenaed and on standby, had left the state and would not return until February 26, 1990; thus, the State wanted a one-week continuance. The witness coordinator testified regarding her efforts to contact this witness, a doctor who treated the victim. When she spoke to the doctor, he indicated that, despite his subpoena, he would not be available to testify. The prosecutor stated that the doctor's testimony was material and indicated why it could not be obtained from any other source. The court granted the continuance and denied appellant's oral motion for dis-

missal. Given a choice between a February 26th or March 12th trial date, appellant's counsel opted for the latter. Accordingly, the court instructed appellant to file all motions in limine by March 7th.

Later, on February 23, 1990, appellant's counsel moved for dismissal. This motion never had a hearing date. On March 12, 1990, due to the prosecutor's illness, the court reset the case for March 26, 1990. On March 26th, before selecting a jury, the court heard appellant's motions in limine. The court heard all seven of appellant's motions in limine and granted only motions three and four. Motion number three was, substantively, a motion to suppress appellant's written statement to the police. Noting that this motion was not timely made, the court nevertheless set a suppression hearing, to be held out of the jury's presence, once the parties completed voir dire.

As a preliminary matter, this court notes that appellant's brief presented her points of error in a manner which was, at best, difficult to understand. Rule 74 of the Texas Rules of Appellate Procedure states that the purpose of a brief is to acquaint the court with the points relied upon, the manner in which they arose and such argument of facts and law to enable the court to decide those points. Rule 74 also provides that although complaints made regarding several issues or findings relating to one ground of recovery or defense may be combined in one point, separate record references must be made. The argument shall include (a) a fair, condensed statement of the facts pertinent to such points, with reference to the pages in the record where the same may be found, and (b) such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue. Repetition or prolixity of statement or argument must be avoided. If typewritten, the brief must be double-spaced.

In the present case, appellant's counsel filed a single-spaced brief asserting numerous subpoints within the ten points of error appellant asserted. For example, point one is comprised of six subpoints, point four is comprised of nine subpoints, point six is

actually twenty-three subpoints, point nine complains of relief not requested at trial and point ten is a global reiteration of the first nine major points of error. Appellant routinely fails to point out how, or even whether, error was preserved, fails to cite to governing authority or merely refers to a portion of a constitution or a reference to "many cases" found under a note of decisions in an annotated volume of the law or refers to the record for the substance of her appellate argument. Despite these deficiencies, we will review appellant's points of error.

■ In her first point, appellant contends that the trial court "erred and abused its discretion in its timing of settings for hearings and trial." Specifically, appellant asserts by six subpoints that the trial court abused its discretion by granting three of the State's motions for continuance, by setting the case for trial on March 26, 1990, a date and time, she asserts, conflicting with two prior felony settings and a Federal civil setting scheduled for over a year, all of which required attendance by appellant's counsel, by "effectively denying her a reasonable and adequate pretrial," and by denying her a fair trial and due process by reason of any or all of the above. Appellant's arguments involve various state and federal constitutional provisions and state statutes. In the instant case, the arguments are sufficiently clear for this court to address; however, by combining more than one legal theory in a single ground, an appellant risks rejection because the point of error is multifarious and presents nothing for review. *Rivera v. State*, 808 S.W.2d 80, 95 (Tex.Crim.App.1991); *Thomas v. State*, 723 S.W.2d 696, 698 n. 2 (Tex. Crim.App.1986); *Green v. State*, 745 S.W.2d 477, 479 (Tex.App.—Corpus Christi 1988, pet. ref'd).

When the case was called on March 12, 1990, the prosecutor announced that the State was ready for trial but that she was ill, had been bedridden for the past three days and had a doctor's appointment later that day. She noted that, at that time, she was the only person from the district attorney's office who was prepared to try the

case. Appellant's counsel recognized that the prosecutor was ill and "would very properly be excused from trying the case." The court reset the case for March 26, 1990, and, noting that appellant's counsel also had a pre-trial motion scheduled in federal court for the same day, stated that the new setting was "of course, subject to you [appellant's counsel] being available." The court also asked the State to arrange for an alternate prosecutor to avoid another continuance.

Additionally, appellant fails to point out that the two pending state trials at issue were in the same court as hers, that the trial court knew this and that it scheduled appellant's case higher on its docket than the other two. The trial court also noted that the federal hearing took precedence over picking a jury on March 26th and therefore, should appellant's counsel have a schedule conflict, the state court would postpone jury selection for appellant's trial until March 27th. As a final note, appellant failed to ask for a continuance at the March 12th docket call and announced that she was ready for trial on March 26th, despite her counsel's scheduling difficulties. This court does not see that appellant was injured in any way when the trial court tried to specify a trial date within the scheduling restrictions faced by her counsel and the prosecutor's serious illness.

■ In subpoint five to point one, appellant contends that the trial court "effectively den[ied] her a reasonable and adequate pretrial." Appellant apparently contends that she was denied an adequate pretrial because her counsel had obtained settings for pretrial motions from the court manager and that the trial court was absent during the times set for those hearings. Nothing in the record supports this contention except appellant's counsel's assertions. Appellant also contends that she attempted to present her motions in limine at the pretrial hearing on March 26, 1990, some of which the trial court allegedly denied but later allegedly granted, and that the prosecutor allegedly interrupted appellant's arguments with a "suggestion" after which the trial court stated that it wished to

proceed with jury selection, thus "rushing" appellant's presentation of her motions in limine.

■ This contention is without merit. Appellant confuses the purpose of a motion in limine with that of a motion to suppress the evidence. A motion in limine is a written motion usually made before or after the beginning of a jury trial for a protective order against prejudicial questions and statements. Its purpose is to avoid injection into trial matters which are irrelevant, inadmissible and prejudicial. Granting a motion is not an evidentiary ruling, and when properly drawn, is not error. *See Nunfio v. State,* 808 S.W.2d 482, 484 n. 1 (Tex.Crim.App.1991); *Norman v. State,* 523 S.W.2d 669, 671 (Tex.Crim.App.1975), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 259 (1975). By definition, a motion to suppress is a device used to eliminate from a criminal trial evidence which has been secured illegally, generally in violation of the Fourth, Fifth or Sixth Amendments to the United States' Constitution.

From indictment to re-indictment to the date trial commenced, the record does not document any denial of opportunity for appellant to assert her pre-trial matters. Furthermore, appellant presented all of her motions in limine with their supporting arguments at the March 26th pre-trial hearing. Although it noted that it preferred not to keep venirepersons waiting for a long time, there is no evidence that the trial court "rushed" appellant's presentation of her motions.

Finally, the prosecutor's "suggestion" was merely an assertion by the State that, at that time, it was prepared to participate in the hearing examining the voluntariness of appellant's statement. The court responded that it preferred to select a jury before holding this hearing. Nothing in the prosecutor's statement indicates that it prompted or was calculated to prompt the trial court to deny appellant sufficient time to present her motions in limine. To the contrary, the record indicates that appellant actually presented all her motions in limine during the hearing in question and did so before voir dire.

■ Appellant contends in subpoint six that the granting of the State's motions for continuance, the ultimate trial setting, and the trial court's actions on her pre-trial motions and motions in limine resulted in an unfair trial. Nothing in the record supports this contention. Appellant fails to explain how granting the State several continuances harmed her and of what pretrial action the trial court deprived her. Subpoints four, five and six to point one are overruled.

■ By point two appellant contends that the trial court "erred and abused its discretion" by failing to grant her first motion for dismissal alleging denial of due process for granting the State's first motion for continuance and a denial of her constitutional right to a speedy trial. By point three, appellant contends that the trial court "erred and abused its discretion" by denying her second motion for dismissal alleging that when the trial court granted the State's second motion for continuance, it denied her due process and her constitutional right to a speedy trial. By the first three subpoints to point one, appellant contends that the trial court "erred and abused its discretion" by granting the State three continuances. Specifically, she asserts that had the State indicted her earlier for the greater offense she would have had more time to prepare her case, would have taken advantage of such time and would have prepared a different defense.

Appellant was arrested June 26, 1989, and from August 28, 1989, to October 30, 1989, the date of the first motion for continuance, she remained in jail because she did not pay the $100 necessary to make the bail which her counsel recommended to the court. The next day, the court granted the first continuance and released appellant on bond with the condition that she not contact her daughter without permission from the Department of Human Services, then the child's temporary managing conservator. Appellant was free on bond until her sentencing on March 30, 1990.

■ A criminal action may be continued on the written motion of the State or of the defendant, but only for as long as necessary, and only upon a showing of sufficient cause which is fully set forth in the motion. Tex.Code Crim.Proc.Ann. art. 29.03 (Vernon 1989). Nevertheless, continuances can deny an accused his right to a speedy trial. In *Barker v. Wingo*, 407 U.S. 514, 531, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), the United States Supreme Court established a balancing test using four nonexclusive factors when determining whether an accused was denied a speedy trial. These factors are (a) the length of the delay, (b) the reason for the delay, (c) the defendant's assertion of the right and (d) prejudice to the defendant resulting from the delay. *Chapman v. Evans*, 744 S.W.2d 133, 136 (Tex.Crim.App.1988).

## LENGTH OF THE DELAY

There is no constitutional basis for holding that the speedy trial right can be quantified into a specific number of days or months. *Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192; *Perkins v. State*, 504 S.W.2d 458 (Tex.Crim.App.1974), *overruled on other grounds*, 522 S.W.2d 479 (Tex.Crim.App. 1975). Unless the delay is long enough to be presumptively prejudicial to the defendant, the reviewing court need not examine the other factors. *Wingo*, 407 U.S. at 530–31 n. 31, 92 S.Ct. at 2192 n. 31. Whether the delay was prejudicial is determined on a case-by-case basis. *Chapman*, 744 S.W.2d at 136. In *Chapman*, the court found that the defendant was denied a speedy trial when more than two and a half years had passed since the initial indictment and where the State could show no justification for that delay other than a crowded trial docket. Conversely, in *Russell v. State*, 598 S.W.2d 238, 248 (Tex.Crim.App.1980), the court held that the defendant failed to show that he was prejudiced because of a nine-month delay between indictment and trial. In *McCarty v. State*, 498 S.W.2d 212, 218 (Tex.Crim.App.1973), after applying the four *Wingo* factors the court concluded that a two year and seven month delay between indictment and trial did not deny the defendant's right to a speedy trial. *See also Courtney v. State*, 472 S.W.2d 151, 154 (Tex.Crim.App.1971) (defendant not

prejudiced because he failed to assert his speedy trial right until three years and five months after indictment when trial occurred one month later and defendant did not show or attempt to show how the delay prejudiced him).

■ Appellant's constitutional right to a speedy trial did not attach until her June 30, 1989, indictment. *United States v. Marion*, 404 U.S. 307, 313, 320–21, 92 S.Ct. 455, 463–64, 30 L.Ed.2d 468 (1971); *Chapman*, 744 S.W.2d at 136. Her trial began almost nine months later. The time between indictment and trial lengthened because of three continuances. We find that the trial court granted those continuances for legitimate reasons and find no evidence that the period between indictment and trial prejudiced appellant's ability to defend herself. The delay was not presumptively prejudicial to appellant.

## REASON FOR DELAY

Closely related to length of delay is the reason the government assigns to justify the delay. *Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192. As previously stated, the court granted the first continuance because the State indicated that it wished to re-indict appellant for a more serious offense. The court permitted appellant's counsel to reset the trial date and set his pretrial hearing dates. Appellant's counsel scheduled the hearing for January 11, 1990, more than two months later. The State requested only a one-week delay in its second motion for continuance because the necessary witness would then be back in town and available to testify; nevertheless, appellant's counsel preferred a later setting for March 12. The final continuance occurred because the prosecutor was ill and did not have a qualified replacement. The court postponed the case for two weeks at which time trial commenced.

■ A missing witness is a valid reason for continuance and serves to justify appropriate delay, while a more neutral reason such as negligence or overcrowded courts should be weighted more heavily. *Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192. A deliberate attempt to delay the trial in order to hamper the defense should be weighted most heavily against the State. *Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192. In the present case, we find that the State had valid reasons for all three of its continuances. Without more, we do not see that the delays were unjustified.

## APPELLANT'S ASSERTION OF HER RIGHTS

The defendant's assertion of his speedy trial right is entitled to strong evidentiary weight in determining whether the defendant is deprived of the right and failure to assert the right makes it difficult to prove that he was denied a speedy trial. *Wingo*, 407 U.S. at 533, 92 S.Ct. at 2193; *Chapman*, 744 S.W.2d at 137. In her two motions for dismissal, appellant clearly asserted her right to a speedy trial.

## PREJUDICE TO THE APPELLANT

■ The right to speedy trial is designed to (a) prevent oppressive pretrial incarceration, (b) minimize the defendant's anxiety and concern and, most importantly, (c) limit the possibility that the defense will be impaired. *Wingo*, 407 U.S. at 532, 92 S.Ct. at 2193; *Chapman*, 744 S.W.2d at 137; *cf. United States v. MacDonald*, 456 U.S. 1, 8, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1982). The defendant invoking his right to a speedy trial must show that he suffered some prejudice as a result of the delay. *Chapman*, 744 S.W.2d at 137; *Harris v. State*, 489 S.W.2d 303, 308 (Tex.Crim. App.1973).

Appellant actually concedes that the continuances were not to her detriment by stating in her second motion for dismissal that "it is difficult if not impossible to ascertain the harm that has been done" to her because of the "wrongful delays and continuances" caused by the State but, nevertheless, she suffered "substantial harm." Considering the length of the delay, the reasons for granting the continuances, and appellant's failure to show prejudice because of the delay, we hold that the trial court properly denied appellant's motions for dismissal. Appellant

was not deprived either of her due process rights or her constitutional right to a speedy trial. Points two, three and subpoints one, two and three of point one are overruled.

██ In point four, appellant contends that the trial court "erred and abused its discretion" by overruling her objections during voir dire. In the first of four subpoints, appellant contends that the Court erred because appellant is Black and there was only one Black in a panel of thirty-six venirepersons. Appellant fails to designate the corresponding dialogue in the statement of facts where such error occurred as well as to discuss why only one Black in the panel was harmful to her. We note that appellant attempted to strike this juror for cause. Nevertheless, construing this subpoint as a challenge to the array, appellant failed to preserve error for review. A challenge to the array must be in writing distinctly setting forth the grounds for the challenge and the defendant must support the challenge by either personal affidavit or affidavit of any credible person. Tex. Code Crim.Proc.Ann. art. 35.07 (Vernon 1989).

██ In subpoint two, appellant contends that the court erred by denying her challenges for cause regarding venirepersons 3, 5, 7, 8, 22 and 26. Appellant cites no authority and presents no discussion of how such alleged error harmed her; however, our review of the record indicates that her grounds for challenging the six prospective jurors were not proper bases for challenges for cause. *See* Tex.Code Crim.Proc.Ann. art. 35.16 (Vernon 1989). Furthermore, appellant never objected that the court's refusal to grant her strikes forced her to be judged by unacceptable jurors and she did not request additional peremptory strikes; thus, error, if any, was not preserved. *Jacobs v. State,* 787 S.W.2d 397, 405 (Tex.Crim.App.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 231, 112 L.Ed.2d 185 (1990).

██ In subpoint three, appellant contends that the court erred by not granting her sufficient time to make her peremptory strikes. Again, appellant neither cites authority nor presents a discussion of alleged error regarding this point. Appellant's counsel complained that ten minutes would not suffice for him to make his strikes, but did not object when the court gave him only fifteen minutes in which to do so. Additionally, the court permitted appellant to change her strikes after the panel was called. Appellant presents nothing for review in this subpoint.

██ In subpoint four, appellant contends that the court denied her constitutional rights to trial by jury, equality and due process when it denied her motion for mistrial when the State, in opening argument, misinformed the venirepersons about "recklessness." Appellant again omits any discussion regarding how she was harmed by this action. The record indicates that the prosecutor attempted to explain how this culpable mental state might relate to possible lesser included offenses. Error, if any, was cured by the court's subsequent lengthy instruction regarding definitions. Point four is overruled in its entirety.

██ In point five, appellant contends that the trial court erred when it admitted into evidence appellant's written statement to the police.

At the admissibility hearing, Sergeant Gary Garrett a child abuse investigative specialist for the Corpus Christi Police Department testified that he took appellant's statement. Garrett recalled that he told Rita Soto, a caseworker for the Department of Human Services, "to have her [appellant] come in and see me" so that he could interview her regarding the injuries received by her child. Appellant subsequently appeared at the police station for the interview.

Garrett stated that before he took appellant's statement he informed her of her *Miranda* rights. After she indicated that she understood her rights, Garrett asked her some questions. After the interview and before appellant left the police station, Garrett typed the statement and gave it to appellant to read and to correct any errors. Appellant read the statement, corrected a misspelled word and signed the statement

in front of Garrett and Officer Hugo Stimmler. Appellant left the police station after approving the typed statement. She never indicated that she wished to terminate the interview and leave nor did she request an attorney. Garrett did not arrest appellant.

Appellant testified that Soto told her that "I [appellant] had to talk to him [Garrett]." Accordingly, she walked to the station and was there for approximately fifteen to twenty minutes. Appellant gave Garrett her statement in a private room at the police station. She stated that she did not feel free to leave "anytime she wanted to" because she was scared. There were uniformed officers present, although she did not recall Garrett wearing a uniform. She did not tell Garrett that she did not wish to speak to him. The trial court denied appellant's motion to suppress her statement, stating that the document's contents "speaks for itself."

Appellant's statement contained appellant's acknowledgment that she had received her Miranda warnings at 3:00 p.m. on January 11, 1989, that she understood the warnings and was waiving them to make her statement. At 3:48 p.m. that same day, appellant read and signed her completed statement before witnesses Garrett and Officer H.L. Stimmler. The statement provided that at approximately 1:00 p.m. of early December, 1988, appellant was at home with her infant daughter, E.[H.] The infant would not stop crying, despite being fed and cleanly diapered. Angered at E. because she would not stop crying, appellant picked the infant up by the legs and "began to swing her back and forth, her head was pointed down." Appellant swung the child for approximately ten minutes, after which the child stopped crying. After several days, appellant noticed that E.'s thigh was swollen, so she took the infant to the hospital for treatment. That is when the doctor treated the child and Child Welfare took custody of E.

█ A defendant seeking to suppress evidence on the basis of a Fourth Amendment violation must produce facts showing that, as a matter of law, a reasonable person would believe he was significantly deprived of his freedom at the relevant time. *Russell v. State*, 717 S.W.2d 7, 9 (Tex.Crim. App.1986); *Mattei v. State*, 455 S.W.2d 761, 765–66 (Tex.Crim.App.1970). In the absence of such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person. *Russell*, 717 S.W.2d at 10.

The instant case is similar to that of *Meek v. State*, 790 S.W.2d 618, 621–22 (Tex. Crim.App.1990), in that the defendant voluntarily appeared for an interview at the El Paso Fire Department headquarters the day after one of its fire investigators requested an interview. Before the interview, only defendant's wife was suspected of burning a house. At the interview, the defendant gave a statement implicating himself as a party to the fire. After giving his statement, the defendant left the investigator's office. He was not formally arrested until more than a month after his statement was taken.

At trial, the defendant moved to suppress his statement, alleging that when he arrived at the fire station, he was handcuffed, told that he was under arrest without benefit of any Miranda warnings, intimidated, and told that he would be allowed to go if he told the investigator "what he wanted to hear" regarding the fire in question. In contrast, the investigator testified that no threats, promises or coercive actions were used to obtain the defendant's statements, and that the defendant was never deprived of his freedom in any way during his visit to the station. The investigator testified that the defendant was free to leave at any time and could have done so on one occasion when the defendant, unaccompanied by any State authority, left the building to retrieve some papers from his automobile.

The trial court found at the suppression hearing that the defendant was neither handcuffed nor intimidated when he gave his statement to the fire investigator. The Texas Court of Criminal Appeals affirmed, holding that all the relevant circumstances surrounding the defendant's statement in-

**440**

dicated that he was not in custody despite the fact that Miranda warnings were not administered before he gave his statement. In doing so, the court stated that to determine whether "custody" existed several factors should be considered, namely, the "focus" of the police officer's investigation blended with "whether the reasonable person would believe that his freedom was being deprived in a significant way," or, in another approach, factors such as the probable cause to arrest, the subjective intent of the police, the focus of the investigation, and the subjective belief of the defendant. *Meek,* 790 S.W.2d at 621; *see Wicker v. State,* 740 S.W.2d 779, 786 (Tex.Crim.App. 1987), *cert. denied,* 485 U.S. 938, 108 S.Ct. 1117, 99 L.Ed.2d 278 (1988); *Shiflet v. State,* 732 S.W.2d 622, 624 (Tex.Crim.App. 1985).

In the present case, Garrett was investigating a report of possible child abuse. E.H. was in the custody of Child Welfare officials and receiving medical attention for her injuries. E.H.'s attending physicians and the support staff found that her injuries were consistent with Battered Child Syndrome (BCS) and that appellant was not responsive to questioning about how E.H. might have received her injuries. Garrett's investigation would include interviewing the child's mother for information about the child and possible abusers. At the time appellant visited the station of her own accord, Garrett subjectively believed that appellant caused E.H.'s injuries, although he did not inform appellant of his suspicion. There was no probable cause to arrest appellant before she gave her statement, and while and after giving that statement she was free to leave. Appellant's merely being "scared" while making her statement, without that emotion being prompted by aggressive action from Garrett or another officer, did not constitute a custodial interrogation. From the totality of the circumstances there was ample evidence in the record to support the trial court's finding that appellant was not arrested or illegally detained at the police station. *See Meek,* 790 S.W.2d at 620; *Melton v. State,* 790 S.W.2d 322, 324 (Tex.Crim.App.1990); *Livingston v. State,* 739 S.W.2d 311, 328 (Tex.

Crim.App.1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). Point five is overruled.

In point six, appellant contends that the trial court erred throughout the trial by "permitting unfair prosecutorial tactics and other unfair procedures." Appellant enumerates twenty-three specific instances of allegedly unfair and improper remarks, some recorded and others not recorded in the statement of facts, whose aggregate "can easily cause an innocent party to be found guilty." She then concedes that she objected to some, but not all, of the allegedly erroneous statements. Appellant cites no authority and does not discuss how these instances effectively denied her a fair trial. This point is clearly multifarious and presents nothing for review. *Rivera,* 808 S.W.2d at 95; *Green,* 745 S.W.2d at 479. Point six is overruled.

Appellant contends in point seven that the trial court deprived her of her due process rights when it denied her motion for acquittal or directed verdict. Appellant filed her motion after the State rested its case-in-chief. After the motion was denied, appellant presented her defense. Appellant contends in point nine that the trial court "erred and abused its discretion" when it denied her a "directed verdict on grounds of incomplete investigation and insufficient evidence."

A challenge to the trial judge's ruling on a motion for an instructed verdict is in actuality a challenge to the sufficiency of the evidence to support the conviction. *Madden v. State,* 799 S.W.2d 683, 686 (Tex. Crim.App.1990). In reviewing the sufficiency of the evidence, the appellate court views all the evidence, both State and defense, in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Madden,* 799 S.W.2d at 686; *Butler v. State,* 769 S.W.2d 234, 239 (Tex. Crim.App.1989); *Arguijo v. State,* 738 S.W.2d 367, 369 (Tex.App.—Corpus Christi 1987, no pet.). If the evidence is sufficient to sustain the conviction, then the trial

judge did not err in overruling appellant's motion. We now proceed with a detailed review of all the evidence presented at trial.

Kealia Ann Didear, medical records administrator for Driscoll Children's Hospital, testified that she prepared a copy of the medical records made for E.H., appellant's daughter. The records show an original admission date of December 13, 1988, with several subsequent admissions and outpatient visits in 1989.

Dr. Raymond Lewandowski, a physician specializing in clinical genetics, testified that he was called to the emergency room on December 13, 1988, to examine E.H. Because emergency room X-rays revealed a fresh leg fracture in addition to a number of older fractures to E.H.'s legs, the attending physicians wanted Lewandowski to determine whether E.H. had a genetic abnormality, specifically *osteogenesis imperfecta*, known as "brittle bone disease." Lewandowski examined E.H. and found a larger than expected head size. A CT-scan revealed that her skull was fractured on both sides and in the back, an enlargement of the fluid-holding chambers within the brain and an abnormal increase of fluid in the subdural area. Nevertheless, other than the tenderness associated with her leg fracture, E.H. did not exhibit the characteristic symptoms of the brittle bone disease. After examining E.H., her CT-scan and X-rays, and reviewing the historical information provided by appellant in E.H.'s records, Lewandowski opined that she did not have brittle bone disease; rather, her symptoms were consistent with BCS because E.H.'s multiple injuries were sustained over a long period.

Lewandowski stated that BCS is a term describing children who suffer trauma that is inflicted as opposed to medical problems that result from an underlying medical abnormality or disease. E.H.'s subdural head injuries indicated that the head was hit against a blunt object or hard surface. The multiple fractures indicated that E.H.'s head received more than one such blow. E.H. could have died had her injuries gone untreated.

Tammy Ann Shields, a registered nurse at Driscoll Children's Hospital, testified that she was working in the emergency room when appellant brought E.H. in for treatment. Appellant was alone. Shields took E.H.'s vital signs and began asking questions regarding why appellant brought the child to the hospital. Appellant responded that E.H.'s upper left leg was swollen, and that she did not walk or crawl. Shields asked if E.H. had fallen and appellant responded that she had not. Shields noted that E.H. lay on the examining table, not crying or moving. She also noted that appellant had no emotional reaction to the situation; rather, she sat at a distance from E.H. and did not try to console or comfort her. Shields stated that it was unusual for a twelve-month-old infant not to crawl or walk or roll and that this inactivity indicated slow development. Furthermore, it was unlikely that an immobile infant could have caused its own fall.

Dr. Fred Perez, Jr., an orthopedic surgeon at Driscoll Children's Hospital, was asked to examine E.H. approximately thirty-five minutes to an hour and thirty minutes after she arrived for emergency care. In Perez' specialty it is customary to deal with fractured bones in infants. E.H. had some swelling about her left femur, but X-rays revealed a "healing" fracture, a callous formation on the bone indicating that the fracture occurred some ten to fourteen days before. Perez stated that healing fractures on a child who has not been treated by a physician for that fracture causes the physician to suspect child abuse because such an injury is extremely painful and the child would respond by constantly crying. He revealed that a fractured femur is very unusual because it is the strongest bone in the human body. When confronted with a broken femur in a child, a doctor suspects three possible causes, brittle bone disease, accidental trauma, or non-accidental trauma, better known as child abuse.

Perez questioned appellant about E.H.'s injuries and appellant responded that she did not know how the fracture could have occurred. Appellant indicated that she was

the one who cared for the infant. Appellant appeared to not comprehend "what was going on" at the time Perez talked with her.

Because he suspected child abuse, Perez recommended that E.H. be admitted to the hospital for care and that a complete body scan for other injuries be performed. Further examination revealed healing fractures in both lower legs and severe head fractures. In Perez' opinion, the untreated skull injuries could have caused E.H.'s death and the untreated leg fractures, if they damaged the growth plate in the leg bones, could have slowed her progression.

Janice Howard, a child protective specialist with the Department of Human Services (DHS) in Corpus Christi, testified that she was assigned the E.H. case in August, 1989, after the original caseworker, Rita Soto, left DHS. Howard said that DHS became involved in E.H.'s case in December, 1988, after a referral by a Dr. McNeil. When Howard was assigned this case, E.H. was in a "near vegetative state of functioning" and was living in a Corpus Christi foster home, with DHS as her managing conservator. The DHS case plan for E.H.'s case is to petition the court for a termination of appellant's parental rights. E.H.'s father could not be located.

In her interviews with appellant, Howard tried to determine how E.H.'s injuries occurred. She also tried to determine whether another person could have been responsible for the offense but could not locate anyone. In that pursuit, she asked appellant whether someone was living with her and E.H. at the time of the child's injuries. Appellant responded that she lived alone with E.H. and that no one else had access to the infant. Appellant provided the name of E.H.'s father but despite Howard's diligent search, he could not be located. Howard stated that Soto's file notes revealed that appellant stated that she had a boyfriend but there was no other indication that she, in fact, had one. Soto's notes also revealed that the boyfriend did not live with appellant at the time of the offense. Howard did not inquire whether the boyfriend or one of the boyfriend's relatives

might have injured E.H. Howard never interviewed anyone other than appellant about others who might have had access to E.H. at the time of the offense because she was assigned this case after its investigatory phase was completed and because appellant's answers to Howard's questions were consistent with her answers previously noted in the DHS file that no one else could have injured E.H. Since E.H. has been in foster care, she had three operations to correct conditions caused by her injuries, namely, a shunt in her head to drain fluid accumulated as a result of her head fractures, resetting the broken bones in her legs and a third to correct lazy-eye, to put drainage tubes in her ears and to remove her adenoids.

Howard later admitted that she had some information that others might have had access to E.H. She did not investigate this possibility because such an investigation is in the province of law enforcement officers. Howard did discuss this information with Garrett, the law enforcement official assigned to the case. She did not ask Garrett to go out and investigate the information. In her experience with DHS as a protective services caseworker, Howard opined that if a parent was accused of child abuse and that parent knew or had an idea someone else was the abuser, it would be consistent with the parent's innocence to accuse that person who he believed was the real culprit. In all the interviews Howard had with appellant, she never identified anyone to Howard who might have abused E.H. The goal of Child Protective Services is to protect the child. A decision to remove a child from the home under temporary orders would be based upon the home atmosphere and the main caretaker. It would not be relevant to the removal decision if there was someone else in the home because, in this case, the mother failed to protect her child from harm.

Dr. Tom McNeil, a pediatrician on staff at Driscoll Children's Hospital, testified that he examined E.H. while she was in the emergency room and diagnosed multiple fractures to the skull, a large amount of subdural hematomas, bleeding in the brain on both sides of the head, a broken left

femur and evidence of previous fractures of both tibias. In his experience as a pediatrician, McNeil had opportunities to observe suspected child abuse victims. In his opinion, E.H.'s condition and the fact that the patient's history was not consistent with her injuries supported a diagnosis of child abuse. McNeil once spoke to appellant through a telephone call but never conferred with her in person. In that telephone conversation, he asked appellant how E.H.'s injuries could have occurred. Initially, appellant offered no explanation then later stated that she remembered that long before now E.H. had fallen off the bed and maybe that had something to do with her injuries. Based upon his medical experience, McNeil believed that appellant's explanation of the child's injuries was unrealistic. The skull fractures E.H. sustained could not occur merely by shaking the infant; rather, to obtain the fractures and the large amount of bleeding in the brain which E.H. had "would take a significant amount of force" such as falling off a balcony, a car wreck, or possibly swinging an infant by the legs, causing the head to contact a hard surface. Despite the fact that breaking a femur required a significant amount of force, it was possible to break a femur by forcefully swinging an infant back and forth by the ankles and dashing the head against a wall. Additionally, the subdural hematomas were diagnosed as "chronic," meaning that they had existed for a long time, and the multiple skull fractures could only be explained by repeated blows to the head.

Because of E.H.'s injuries and with concern about her future safety, McNeil referred the situation to DHS as a child abuse case. In his opinion, untreated multiple skull fractures could not have caused death but the subdural hematomas and the brain bleeding going untreated could have caused her death. The femur was deformed due to the fracture. A normally developing twelve-month-old would ordinarily be toddling, but E.H.'s fractures prevented this.

Sharon Crowe, supervisor of the DHS's Child Protective Services testified that she was with DHS at the time E.H.'s case was referred for investigation. Crowe had contact with both appellant and E.H. during the time that the case was opened and was familiar with the initial investigation that was performed. During that investigation, she did not have any knowledge about anyone else who might be suspected of causing E.H.'s injuries. Her knowledge was based upon information provided by a DHS caseworker and her own interview with appellant. The premises where the injuries allegedly occurred were not investigated because, in this particular case, there was adequate information from appellant and E.H.'s doctors to verify the risk to the child in that home. No further investigation was done because DHS focuses on the issue of whether the child is safe in the home. Crowe stated that the information available at the time E.H. was hospitalized in December, 1989, made it clear that going back to her home would be a risk for the infant.

Officer Garrett, testified that DHS referred E.H.'s case to him for a possible criminal investigation. He stated that basically, Soto had done the investigation and that there was no explanation by appellant for the infant's injuries. With this information, Garrett interviewed appellant. He told Soto to "have her [appellant] come in and see me." Appellant came to the police station for the interview at 3:00 p.m. on January 11, 1989. Because appellant was suspected of having injured E.H., Garrett administered the Miranda warnings upon her arrival. He then visited with appellant and wrote down what she said concerning her explanation of the child's injuries. These notes were later typed by Garrett's secretary on a printed statement form which appellant subsequently reviewed, corrected and signed.

Garrett explained the printed statement form on which appellant's statement was typed. At the top of the page is a box with warnings inside. The first warning states, "You are accused of *injury to a child* [typed in for each individual offense]. Warnings two through five set forth the Miranda warnings and number six states, "You have the right to stop this interview

at any time." Underneath the warnings was a question asking whether the reader understood her rights. Appellant wrote "Yes" beside this question and initialled her response. The next question asked whether the reader wished to give up her rights and make a statement. Appellant wrote "Yes" beside this question, initialled it and then signed her name, the date and the time, 3:48 p.m., signifying that she had received the warnings. Below the signature was a typed paragraph containing appellant's statement. Below the statement, appeared appellant's signature, the date, the time, 3:53 p.m., and the signatures of her witnesses, Garrett and Officer Stimmler.

The statement provided that at approximately 1:00 p.m. of early December, 1988, appellant was at home with her infant daughter, E.H. E.H. would not stop crying. When appellant fed and diapered E.H., "she stopped crying for awhile," then resumed her crying. Angry because E.H. would not stop crying, appellant picked the infant up by the legs and "began to swing her back and forth, her head was pointed down." Appellant swung the child for approximately ten minutes, after which the child stopped crying. After several days, appellant noticed that E.H.'s thigh was swollen, so she took the infant to the hospital for treatment. That is when the doctor treated the child and Child Welfare took custody of E.H. Appellant's statement concluded by stating that she gave this statement to Sergeant Garrett of the Corpus Christi Police Department, that the statement was true and correct to the best of her knowledge and given of her own free will.

Appellant gave her statement to Garrett in an interview room, a small room just off the main office. The room had no windows and just one door. He did not remember whether the door was open or closed on the occasion in question. She was free to leave at any time. Appellant did not appear scared or intimidated to Garrett. While giving her statement, Garrett provided appellant with a doll so that she could demonstrate how she swung E.H. During their conversation, appellant mentioned a baby-sitter or a boyfriend's daughter having access to E.H. several days before the offense. Later, she indicated that on the day of the offense, she was the only one home with E.H. Garrett did not visit appellant's address after the offense nor did he attempt to see whether anyone witnessed the offense. He did not try to find a witness because appellant said she was the only one at home with the child and he could only ask a person not present during the offense whether they heard a baby crying. In his many years' experience in law enforcement and felony child abuse, that abuse is generally not committed before witnesses. Furthermore, in his experience, a person suspected of child abuse generally does not admit the entire extent of what is done to a child.

Rita Soto testified for the defense that she recently worked for DHS as a caseworker in the Child Protective Services section. Her principal duty was to investigate abuse and neglect cases. Soto received notice of a possible abuse case at Driscoll Children's Hospital on December 13, 1988. She investigated the child's situation and the hospital and contacted appellant. In their conversation, Soto asked appellant if she had injured E.H. Appellant denied any wrongdoing but then told Soto that there was no one else who may have hurt the infant. She stated that she lived alone with E.H. Appellant exhibited very little emotion during the interview, she "didn't seem to react much" and did not volunteer any information. She answered Soto's questions with one or two word sentences. When Soto informed appellant that E.H. had been abused, appellant remained, at least facially, emotionless and expressionless. Throughout the months which Soto investigated this case, appellant always had the same emotionless, expressionless look on her face. On one occasion, appellant maintained this demeanor but tears came from her eyes. The only time Soto saw appellant behave differently was when she screamed and cried when E.H. was placed in foster care.

In one of Soto's conversations with appellant, she indicated that she had a boy-

friend, George Chase. Chase lived with his mother and had two children. His daughter once babysat E.H. Appellant indicated that the babysitter could have dropped the infant. Later, appellant admitted to "slapping the child on the leg" but denied having done anything to cause the head injuries. Soto investigated appellant's home on one occasion. Appellant lived in government housing and had a mattress on the floor in the living room, her primary living area. Soto concluded that DHS, as part of a "good investigation," should have interviewed the babysitter and Chase and others to determine whether they were responsible for E.H.'s abuse. The most damaging factor against appellant was that nothing was done about E.H.'s broken bones.

When Soto visited the hospital on December 13, 1990, she encountered difficulty in finding E.H.'s biological mother. The hospital staff informed her that the mother, appellant, "seemed to be real anxious to leave and didn't stay long with her child." Appellant admitted E.H. and left the hospital. This concerned the doctors because they needed her consent to begin draining the excessive fluid on E.H.'s brain. She did appear at the hospital two days later. Appellant's absence from the hospital despite E.H.'s severe injuries was another factor supporting Soto's suspicion that appellant might have abused her child. When Soto finally did see appellant visit E.H. she noticed that there was little interaction between mother and child. She would sit by the crib but did not try to comfort the child. Furthermore, appellant did not react with concern to Soto's telling her that the child's injuries were consistent with trauma from abuse and that the child had sustained serious injuries.

Based upon her training and years of experience, Soto believed that appellant had emotional problems which manifested themselves with her expressionless attitude. Other possibilities which could have contributed to her state of mind were drug use and depression. Appellant did not appear to have the ability to nurture E.H. and did not seem to know how to provide or failed to provide care and to exhibit other basic parenting skills. From her own ad-mission of having "slapped E.H.'s legs," Soto believed appellant possessed a violent temper.

Louise Eldridge testified that she had known appellant for approximately five or six years. The two women lived in the same housing project. Eldridge stated that appellant lived with E.H. and that Chase, appellant's boyfriend, also lived in appellant's apartment. Chase is Eldridge's nephew by marriage. He would bring his two children, a son and daughter, to the apartment every Friday for visitation. Eldridge never heard a baby cry or scream in the neighborhood and did not know how E.H. could have been injured. She did not learn that E.H. was injured until a month after the child was hospitalized. She said Chase lived with appellant when she moved into the housing project, but did not know whether he fathered E.H. Later, Chase lived with his mother. Eldridge never saw Chase's children looking as if they had been abused. She suggested that appellant said she lived alone to protect her welfare payments.

The evidence shows that appellant swung her twelve-month-old daughter by the legs "to make her stop crying" and struck the child's head repeatedly and on more than one occasion against a hard surface. The child sustained a broken femur and multiple skull fractures as well as extensive brain trauma. X-rays revealed older fractures in both tibias. The child did not suffer from osteogenesis imperfecta, known as brittle bone disease. Appellant was the only person who had access to the child. The attending physicians diagnosed that the child suffered from BCS. The evidence supports the jury's verdict that appellant caused serious bodily injury to her infant daughter. Points seven and nine are overruled.

■ In point eight, appellant contends that the trial court "erred and abused its discretion" by making a comment in front of the jury allegedly "demonstrating ... his opinion as to guilt." Specifically, appellant asserts that the court should not, at any time before the jury decides the defen-

**446**

dant's guilt or innocence, make any comment that would convey to the jury the court's opinion of the case.

At the close of all the evidence, the court told the jury that once the charge was prepared and read and after the attorneys presented their arguments, "then you will retire to deliberate on punishment—excuse me, I didn't mean to say that. You will be retired to deliberate your verdict." Outside the jury's presence, appellant moved for a mistrial based on this statement. The trial court denied the motion but offered to give the jury more instruction to disregard his remark. Appellant's counsel elected to not have the court give the instruction.

A judicial comment on the evidence constitutes reversible error only when the comment is reasonably calculated to benefit the State or prejudice the defendant's rights. *Davis v. State,* 651 S.W.2d 787, 789 (Tex.Crim.App.1983); *Will v. State,* 794 S.W.2d 948, 951 (Tex.App.—Houston [1st Dist.] 1990, pet. ref'd). Whether the court's statement is a comment on the evidence in this case is arguable. Considering the circumstances in which the statement was made and the fact that the court, sua sponte, recognized his error and immediately corrected himself, we conclude that the statement was inadvertent and not reasonably calculated to benefit the State or prejudice the appellant's rights. No reversible error is shown. Tex.R.App. 81(b)(2). Point eight is overruled.

In point ten, appellant contends that the trial court "erred and abused its discretion by permitting an unfair entire proceeding." She classifies the unfair nature of the proceedings into three categories: (a) speedy trial and continuances, (b) general unfairness throughout and (c) gross failure to investigate. Appellant fails to support these contentions other than merely presenting unexplained references to *Ex Parte Brandley,* 781 S.W.2d 886 (Tex.Crim.App.1989) and to the fifth, sixth and fourteenth amendments to the United States Constitution and their Texas constitutional counterparts. This point is multifarious and presents nothing for review. *Rivera,* 808 S.W.2d at 95; *Thomas,*

723 S.W.2d at 698 n. 2; *Green,* 745 S.W.2d at 479. Point ten is overruled.

The trial court's judgment is AFFIRMED.