**Donna Renae RUSSELL, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 705–84.

Court of Criminal Appeals of Texas,
En Banc.

May 28, 1986.

Nancy Gail Huggins, Jan E. Hemphill, Dallas, for appellant.

Henry Wade, Dist. Atty., & Jeffrey B. Keck, Andy Anderson & Mary Ludwick, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S MOTION FOR REHEARING ON PETITION FOR DISCRETIONARY REVIEW

CAMPBELL, Judge.

Appellant, a juvenile certified for trial as an adult, was convicted by a jury of the offense of murder. V.T.C.A., Penal Code, § 19.02. Punishment was assessed by the jury at confinement for 99 years in the Texas Department of Corrections.

The Fifth Court of Appeals reversed the conviction, finding that evidence of appellant's guilt should have been suppressed because it was the product of an illegal arrest, thus violating the Fourth Amendment.[1] *Russell v. State*, 672 S.W.2d 583 (Tex.App.—Dallas 1984). The Court of Appeals relied upon the test enunciated in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) in determining that the taint of an illegal arrest had not been attenuated when appellant consented to a search of her home and subsequently confessed. We initially denied the State's petition for discretionary review. However, upon rehearing, we granted review to determine 1) whether the Court of Appeals should have applied the *Brown* test under the instant facts, and 2) whether the test was applied correctly. We need not address the second question because we find that no arrest, whether legal or not, occurred prior to appellant's consent to search her home.[2] We will reverse and remand.

On January 18, 1982, while extinguishing a house fire in Dallas, firemen discovered the body of an elderly female. That same day, Police Officer King spoke with appellant, who lived across the street from the burned house, concerning the cutting of telephone wires at a different house in the same neighborhood. Appellant was transported to the police station by Officers King and Graves, given *Miranda* warnings, and questioned as to the fire and the cut telephone wires. Appellant voluntarily accompanied the officers to the police station.

Appellant denied committing the murder and was returned to her home. However, she agreed to return to the police station the following morning. On January 19, 1982, Officer Graves picked up appellant at her home and transported her to the police station where she was again advised of her *Miranda* rights. Appellant was taken to the police department's polygraph examination room and remained there with the polygraph examiners.

During the examination, appellant ran out of the polygraph room, which was on the second floor of the police station, and onto Main Street in downtown Dallas. The

---

1. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *U.S. Const.Amend IV.*

2. This Court's grant of review necessarily extended to the question of whether an arrest took place. In its Petition for Discretionary Review, the State specifically argued that any application of the *Brown* test first depends upon our finding that an illegal arrest took place. In its Motion for Rehearing, after its initial petition had been denied, the State specifically notes: "The State does not concede the return of [a]ppellant to the police station in the instant case was an illegal arrest."

polygraph examiners informed Officer Graves of the incident, and he told them to go after appellant. Appellant soon returned to the police station. The record is silent as to the circumstances surrounding her return.[3] Upon appellant's return, she was provided cigarettes and a soft drink and allowed to calm down. Appellant then signed a consent form, allowing officers to search her home. Officers searched her home and found bloody clothing. Upon being told of the results of that search, appellant orally confessed to the murder of the elderly woman found in the burned house. At that point, appellant was formally placed under arrest. Appellant then provided additional incriminating statements concerning facts surrounding the murder. Both oral statements were reduced to writing and signed by appellant. The police then searched appellant's home again and found the hammer used to kill the deceased.

The Court of Appeals held that "the pursuit and return [of appellant to the police station] amounted to a show of official authority such that 'a reasonable person would have believed that he was not free to leave.'" *Russell v. State*, 672 S.W.2d 583, 587 (Tex.App.—Dallas 1984), quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The Court of Appeals also found that this "arrest" occured without probable cause, thus creating an illegal arrest. *Id.* The Court of Appeals then considered whether the evidence obtained subsequent to that

arrest was tainted by the initial illegal arrest and concluded that it had been tainted. *Id.*

The State argues that the Court of Appeals unnecessarily applied the *Brown* test because appellant had not proven that any arrest, whether legal or not, had taken place prior to giving her consent to search her home.[4] After examining the record, we agree.

When a defendant seeks to suppress evidence on the basis of a Fourth Amendment violation, this Court has placed the burden of proof initially upon the defendant. *Mattei v. State*, 455 S.W.2d 761, 765–66 (Tex.Cr.App.1970).[5] As the movant in a motion to suppress evidence, a defendant must produce evidence that defeats the presumption of proper police conduct and therefore shifts the burden of proof to the State. *Id.*, relying upon *United States v. Thompson*, 421 F.2d 373, 377 (5th Cir.1970) and *Rogers v. United States*, 330 F.2d 535 (5th Cir.1964), cert. denied, 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186. Cf. *United States v. Bachner* 706 F.2d 1121, 1125–26 (11 Cir.1983). A defendant meets his initial burden of proof by establishing that a search or seizure occurred without a warrant. *Mattei*, supra, at 766, quoting *Rogers v. United States*, 330 F.2d, at 542.

Once a defendant has established 1) that a search or seizure occurred and 2) that no warrant was obtained, the burden of proof shifts to the State.[6] *Id.* If the

---

**3.** The only testimony concerning the return of appellant to the police station came from Officer Graves while he was cross-examined by appellant's attorney during the hearing outside of the jury's presence on appellant's motion to suppress. See Appendix, *post*, at pp. 11–13.

**4.** The State does not dispute the claim that no probable cause existed. Instead, the State argues that, without facts sufficient to establish that appellant was under police custody, no illegal *arrest* could have taken place.

**5.** Texas statutory law is silent as to how the burden of proof is distributed in a hearing on a motion to suppress. See Art. 28.01, § 1(6), V.A. C.C.P. This Court, therefore, seemingly has adopted, at least in some respects, the rules

followed by federal courts in distributing the burdens of proof.

**6.** With respect to standing, a slightly different rule applies. A mere allegation by a defendant that he was a victim of an illegal search or seizure, if not disputed by the State, is sufficient to establish standing to challenge a search or seizure. *Clemons v. State*, 501 S.W.2d 92, 93 (Tex.Cr.App.1973), citing *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) and *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). However, once the State challenges the defendant's allegation, the defendant carries the burden of proof. *Id.* At least one federal court of appeals applies this standard to all issues raised under the Fourth Amendment. *United States v. Bachner,*

State produces evidence of a warrant, the burden of proof is shifted back to the defendant to show the invalidity of the warrant. *Rumsey v. State,* 675 S.W.2d 517, 520 (Tex.Cr.App.1984), quoting *United States v. Thompson,* 421 F.2d, at 377. See *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1961); *Williams v. United States,* 382 F.2d 48, 50 (5th Cir.1967). If the State is unable to produce evidence of a warrant, then it must prove the reasonableness of the search or seizure. *LaLande v. State,* 676 S.W.2d 115, 116 (Tex.Cr.App.1984); *Hooper v. State,* 533 S.W.2d 762, 767 (Tex. Cr.App.1976) (Opinion on Rehearing); *Washington v. State,* 518 S.W.2d 240, 242 (Tex.Cr.App.1975).

█ In the instant case, appellant had the initial burden of proving that 1) a seizure occurred and 2) without a warrant.[7] From Officer Graves' testimony it is obvious that no warrant was obtained. However, there is no evidence to support the conclusion that appellant was "seized" sometime after running from the police station and before returning and giving her consent to a search of her home.

The Supreme Court has developed an objective test for determining whether a person has been seized:

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. [footnote omitted] Examples of circumstances that might indicate seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. [citations omitted] *In the absence of some such evidence,* otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person. [emphasis added]

*United States v. Mendenhall,* 446 U.S., at 555, 100 S.Ct., at 1877. See also *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

---

supra. Prior to *Mattei,* supra, it appears that this Court also followed this rule for all suppression issues. See *id.,* at 766 (Onion, P.J., dissenting).

**7.** Cf. *Gregg v. State,* 667 S.W.2d 125, 128 (Tex. Cr.App.1984). In *Gregg,* the State argued that a defendant "consented" to a seizure. We held that a seizure had taken place because the State did not establish defendant's consent *Id.,* citing *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). That holding, while arguably correct in its result, did not accurately state the law.

In *Bumper v. North Carolina,* supra, a defendant presented sufficient facts to establish that his home had been searched without a warrant. The State then responded that, while a search had taken place, no warrant was necessary because the defendant's grandmother had consented to the search. The Supreme Court held that the State failed to prove that the defendant's grandmother freely and voluntarily consented. Notably, however, the Court first determined that a search had taken place.

Likewise, in *Gregg,* supra, a defendant presented sufficient facts to establish that a warrantless seizure had taken place. The State chose to use consent as a basis for making the seizure legal. The majority held that the State failed to prove that the defendant consented to his seizure. Contrary to the majority's mischaracterization of the State's argument, the existence of a seizure did not depend upon whether consent had been given or not. The existence of a seizure depended upon whether the facts established a sufficient restraint upon the defendant's freedom. The existence of consent depended upon whether the facts established that the defendant made a free and voluntary choice. While the two question rely upon similar facts, they are separate questions.

By tangling the question of whether a seizure occurred with the question of whether consent had been given, this Court shortcircuited the manner in which the burden of proof is distributed in a motion to suppress evidence. The State has no burden of proof until a warrantless search or seizure is initially proven by the defendant. By failing to distinguish the facts establishing an initial seizure from the facts establishing a lack of consent, the Court in *Gregg,* supra, mistakenly implied that the State must prove that a seizure took place. To the extent that *Gregg,* places the initial burden upon the State to prove that a warrantless search or seizure took place, it is overruled.

In the instant case, appellant presented no evidence concerning the circumstances of her "seizure." [8] Neither appellant nor the polygraph operators testified. Appellant's attorney did ask Officer Graves on cross-examination whether she was placed under arrest upon being brought back to the police station. Officer Graves testified, "At that time she was still under investigation for the cutting of the wire, but the main reason I had them go get her was because her mind at that period of time was hysterical and I was worried about her safety." During subsequent questioning, Officer Graves stated, "At the point in time when I arrested Donna was immediately after the first voluntary statement."

█ While we might infer from Officer Graves' testimony that he intended for the polygraph operators to restrain appellant and force her to return to the police station, such evidence "is irrelevant except insofar as that may have been conveyed to the [appellant]." *United States v. Mendenhall*, 446 U.S., at 554, n. 6, 100 S.Ct., at 1877, n. 6. Appellant has offered no evidence that she was aware of Officer Graves' intentions. She has also offered no evidence that she was physically threatened or restrained, verbally intimidated, or otherwise compelled by others to return to and remain at the police station.

This Court could only conclude that appellant was "seized" by indulging in speculation as to what convinced appellant to return to the police station and remain. While such a conclusion might be an attractive solution to a difficult question, it would require this Court to ignore its responsibility to decide questions based on facts as presented in the record. *Evans v. State*, 622 S.W.2d 866 (Tex.Cr.App.1981). Having found that appellant failed to meet her burden of proof, we must conclude that no Fourth Amendment seizure has been established.

In the absence of a seizure prior to appellant giving her consent and subsequent confession, the Court of Appeals should not have found that appellant's consent was obtained by exploitation of an illegal arrest. Therefore, we find that the Court of Appeals should not have applied the *Brown* test in the instant case.

The issue remains, however, whether appellant's consent was, in fact, freely and voluntarily given. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina*, supra. Necessarily, the issue of the admissibility of appellant's confession also remains. If the consent to search was involuntary, then the confession might be the product of an illegal search. See *Brown v. Illinois*, supra. Because the Court of Appeals did not decide these issues, we must remand this cause to the Court of Appeals for further consideration.

We reverse the judgment of the Court of Appeals and remand this cause to that court for further consideration of the admissibility of evidence resulting from the consent to search.

CLINTON, TEAGUE and MILLER, JJ., dissent.

### APPENDIX

This is Officer Graves being questioned by appellant's attorney:

Q. When did you first talk to Donna Russell? Was that Monday the 18th?

A. Yes, ma'am; it was while we were still at the scene investigating the fire death.

Q. And you talked to her, I believe, at her residence briefly?

A. That is correct.

Q. When did you next talk to her?

A. The next day approximately 7:30, 8 o'clock in the morning.

Q. After you talked to her at her residence on Monday, the 18th, did she come

---

**8.** We find nothing in the record to indicate that appellant was prevented from presenting such evidence. Cf. *United States v. Bachner*, supra.

downtown and you talk to her again downtown on that day?

A. On the 18th?

Q. Yes, sir.

A. Yes, ma'am; she did.

Q. All right. And what did you talk to her about on Monday, the 18th, downtown?

A. We talked to her about the offense of cutting the telephone wire that occurred at her next door neighbor's residence and I talked to her briefly about the murder.

Q. And did you talk to her Monday, the 18th, about taking a polygraph for you?

A. Yes, ma'am; later in the day we did.

Q. And was she at the Crimes Against Persons office at the time you talked to her about taking the polygraph?

A. Yes; she was.

Q. And did you tell her what the polygraph would concern, what type of offense?

A. Yes, ma'am.

Q. And what was that?

A. The offense of murder.

Q. And did she tell you that she would take it or wouldn't take it?

A. She stated she would take it.

Q. She knew she didn't have to; is that right?

A. That is correct.

Q. Did you or somebody else in your department return Donna to her residence the afternoon or evening of Monday, the 18th?

A. I believe I did.

Q. And then did you or someone else pick her up about 7 a.m. or so Tuesday, the 19th, from her residence?

A. Sergeant Sherman and myself went and got her.

Q. And you went out to get her for the purpose of her taking the polygraph?

A. That is correct.

Q. And what did you do when you got downtown with her?

A. We took her to the polygraph section, turned her over to the investigator handling the polygraph.

Q. All right. When is the next contact you had with her or what's the next thing you heard about her?

A. I heard that she had run out of the polygraph room and the investigators had to go and got her and brought her back up to our office or were bringing her back up to our office.

Q. Did they notify you that she had left or run out of the polygraph room?

A. They did.

Q. Okay. And did you have any suggestions to them concerning that?

A. I told them to go get her.

Q. And where had she gone? Do you know?

A. She had run out on the street and was running down, I believe, Main Street.

Q. And she had run to Main Street from the polygraph room?

A. That is correct.

Q. And what floor is that polygraph room on?

A. I believe it's on the second floor.

Q. And then did some officers go out and get her from the street?

A. The polygraph examiners went and got her for me.

Q. And did they bring her back up to the second floor?

A. They did.

Q. Was she under arrest at that time?

A. At that time she was still under investigation for the cutting of the wire, but the main reason I had them go get her was because her mind at that period of time she was hysterical and I was worried about her safety.

Q. Was she hysterical when she got back up to the second floor?

A. She was still hysterical.

Q. Still hysterical?

A. Let's put it this way, she was crying.

Q. She was crying?

A. That's correct.

Q. Obviously upset?

A. Right.

Q. What did you do with her after she was brought back up?

A. I took her back to my office and I got her a cold drink and some cigarettes and I let her calm down.

Q. And discuss with her why she ran out and et cetera?

A. Yes.

Q. Was it after she was brought back that Officer King obtained the written consent search from her?

A. That is correct.

Q. And did he then leave and call you back later that morning or around noon?

A. It was between the hours of 11 and 12, sometime around there.

Q. And that's when he told you he had recovered some clothes from her residence, taken them to the lab and had been told by lab personnel that they contained human blood?

A. That is correct.

Q. Is that when you arrested Donna?

A. At the point in time when I arrested Donna was immediately after the first voluntary statement.

CLINTON, Judge, dissenting.

May 11, 1984, in *Russell v. State*, 672 S.W.2d 583 (Tex.App.—Dallas 1984), a unanimous Court of Appeals concluded that "appellant was in custody and being detained against her will at the time she gave her statements," because:

"Appellant attempted to leave the police station, but was pursued and returned by the police to the station. We hold that the pursuit and return amounted to a show of official authority such that 'a reasonable person would have believed he was not free to leave.' [citation omitted]. Therefore, we conclude that when the police pursued and returned appel-

lant to the police station, she was effectively seized for purposes of the fourth amendment. We also conclude that appellant's detention was illegal. We reach this conclusion because according to King and Graves they had no probable cause to arrest appellant until after her first oral statement. Reasonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative. [citations omitted]. It follows, and we so hold, that appellant was arrested in violation of her rights under the fourth amendment and that her statements were given during a period of illegal detention."

*Id.*, at 587.

Those findings and conclusions were utilized by the Dallas Court of Appeals in deciding "appellant's challenge to the validity of appellant's consent to search her residence" in light of same factors identified by the Supreme Court in determining whether a confession has been obtained by exploitation of an illegal arrest. See, e.g., *Green v. State*, 615 S.W.2d 700, 708 (Tex. Cr.App.1981) Applying to the facts of this cause, the Dallas Court of Appeals held that her consent to search "was the exploitation of an illegal arrest." *Id.*, at 588.

The State filed a motion for rehearing which was soon overruled by written order June 7, 1984. The State then filed its petition for discretionary review June 15, 1984.

*Sans* grounds for review or questions presented mandated by Tex.Cr.App. Rule 304(d)(4), the petition does give "reason for review," but none within contemplation of Rule 302(c), as required by Rule 304(d)(5). In that shape the PDR is infirm. See *Pumphrey v. State*, 689 S.W.2d 466 (Tex. Cr.App.1985). Rather, the "reason" is a statement that the Court of Appeals erred in holding that the trial court should have suppressed the fruits of the search of appellant's residence, followed by two "subpoints:" the first to the effect that the Court of Appeals erred in applying the test of *Brown v. Illinois* to the consent to

**14**

search;[1] the second that, having done so, the Court of Appeals applied the test to the facts in an improper manner. The petition was refused November 21, 1984.

The instant motion for rehearing was filed December 6, 1984. Its "Ground for Review" in the same statement labeled "reason" in the PDR; its "Reasons for Rehearing" are the same two "subpoints." However, subtitles are omitted and there is no argument about how the Court of Appeals had characterized the "police action," that subject being relegated to a footnote quoted in the sentence of note 2 in the majority opinion. Though the motion presented less than what had been previously considered by this Court, on February 27, 1985 at least five judges voted to grant it.

In due course the judge who drew the cause drafted a proposed opinion for the Court in which was stated, *inter alia:*

> "In its motion, the State argues that the Court of Appeals erred in applying the test enunciated in *Brown v. Illinois* .... to evaluating the validity of appellant's consent to search her home. Alternatively, the State argues that even if the *Brown* test is appropriate, the Court of Appeals applied the test in an improper manner."

In framing the issues on rehearing, quite properly the proposed opinion did not allude to how the Dallas Court of Appeals addressed and resolved the matter of "police action" in pursuing, returning appellant to the station house and there detaining her. In saying, "This Court's *grant of review* necessarily extended to the question of whether an arrest took place," the majority misapprehends purpose and function of motion for rehearing.

Tex.Cr.App. Rule 309(b) dictates that a motion for rehearing "must briefly state its grounds...." Whether granting rehear-

ing after an initial refusal of PDR amounts to a "grant of review" of a particular ground for review depends upon the grounds stated in the motion for rehearing. There is no ground in this motion for rehearing raising "the question of whether an arrest took place." Thus to the extent it was presented in the State's petition for discretionary review, that matter passed out of the cause when we refused the PDR. To iterate a phrase we are all wont to use if the will to enforce our own rules is strong enough, by failing to raise the ground in its motion for rehearing the State waived the question. See, again, *Pumphrey,* supra.

I dissent.

TEAGUE, J., joins.

---

1. In Subpoint A are parts of the argument under subtitles, *viz:* The development of the *Brown v. Illinois* test; the totality of the circumstances test applied to the voluntariness of a consent to search; *Royer v. Florida* does not require an application of the Brown-Dunaway test to the custodial consent to search items or premises not associated with the person of the accused; the Court of Appeals improperly characterized the police action as an illegal arrest or detention of Appellant. In the latter the State suggested the Court "should at least order the case remanded to the trial court for further hearings on this critical issue."