Luis Santos LAGAITE, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–96–01302–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

June 17, 1999.

Frank Blazek, Smither, Martin, Henderson & Blazek, P.C., Huntsville, for Appellant.

David Weeks, Philip Loyd Hall, Criminal District Attorneys, Huntsville, for State.

Panel consists of Chief Justice SCHNEIDER and Justices WILSON and ANDELL.

## OPINION

SCHNEIDER, Chief Justice.

A jury convicted appellant, Luis Santos Lagaite, of capital murder. Because the State did not seek the death penalty, punishment was automatically assessed at confinement for life. We affirm.

## FACTS

Appellant and Carler Allen had been married for eight of the 12 years they had known each other. They had four children, Alexia, Shamail, Natasha, and Kashina. Because of marital problems, including physical abuse, Carler took the children and left in March 1995. Shortly after leaving appellant, Carler began living with Thomas O'Neal "Tim" Freeman. In May 1995, Carler filed for divorce and obtained temporary custody of the children.

Appellant began making threats to Carler, Tim, and Tim's family. He told his children, Alexia and Shamail, that he was going to kill Carler and Tim. One of appellant's co-workers, Donald Ballard, testified that in June 1995, appellant told him of his desire to kill Carler's boyfriend. He repeated the statement in August 1995 and offered Ballard $3000 dollars to spy on Carler and Tim, and to take pictures of them.

Jeanette Tirey was a bookkeeper and former law librarian at the prison where appellant worked. She testified that appellant came to her and asked her questions about the law of murder and capital murder. He also asked questions about child custody and his concern about his wife carrying a gun.

In late October 1995, appellant and Carler had a custody hearing; appellant was concerned because Carler kept a pit bull in her apartment. At the hearing, the court ordered the dog removed from the house. During the hearing, Carler was questioned extensively about the layout of the house. Carler was allowed to retain custody of the children.

On November 5, 1995, appellant became upset at work and again told his co-worker, Ballard, that he was going to kill Tim.

On November 6, 1995, appellant picked up his children for his court-ordered visitation, but he did not return them as ordered. On November 8, 1995, appellant took Alexia and Shamail to the parking lot of Bullwinkle's restaurant and spied on Carler and Tim through the fence.

On November 10, 1995, the day before the murder, appellant asked his co-worker, Ballard, if he remembered the plan; he told Ballard that the next time they met "it would be taken care of".

Also on November 10, appellant took his children to the home of Thomas and Sherry Nickels in Katy, Texas. His daughter, Alexia, testified that appellant put a shotgun in the trunk of his car before leaving Huntsville.[1] They arrived at the Nickels' home at about 7:30 p.m. That night, appellant asked if he could borrow the Nickels' Honda Prelude. Before he went to bed, he went out to his car for a while. Appellant went to bed at about 1:30 a.m. Neither of the Nickels saw appellant again, but Sherry Nickels testified that she heard appellant leave for work at about 6:00 a.m.

Carler testified that on Friday, November 10, she and Tim played video games and watched television before going to sleep at about 4:00 a.m. Shortly thereafter, she heard a shot, then she heard the front door open. A masked figure came in and struggled with Tim, before shooting him in the chest. The masked figure fled the apartment chased by Tim, before Tim finally collapsed on the sidewalk and died.

Carler described the masked figure as taller than Tim. The assailant's clothes were black, and he wore a grey mask. The mask was tight, but she could clearly see the shape of the masked figure's head; it was "long and funny," like appellant's. Carler believed the masked figure was appellant.

The morning after the murder, appellant was late for work. Another co-worker, Kevin Davis, testified that appellant was not in uniform, his clothes were wrinkled, and there was mud on his pants. Davis testified that appellant was nervous and pacing around; appellant also appeared tired. Davis noticed that appellant's feet

1. This fact was not known to police at the time they seized appellant's car.

were wet, and that he took his socks off and put them in front of a fan to dry.

Huntsville Police Officer Joe Thornton testified that he arrived at the scene of the crime at about 4:46 a.m. He recovered two spent shotgun shells, pellets, and blood samples from the scene. The shotgun shells were red, Federal, number 5, 12 gauge shells.

After appellant was arrested, Detective O'Rear located the Nickels' Honda Prelude, which appellant had reportedly driven to work. The car had an unusual amount of water condensation on the interior windows, and the seats and floorboards were wet.

Detective O'Rear asked the Katy police to secure appellant's white Mustang, which was still parked at the Nickels' home. The car was impounded, and, during an inventory, the police recovered a shotgun shell that matched the spent casings recovered from the scene of the crime and a hand-drawn map of Carler's apartment. The police also found a pine tree, which had three shotgun blasts in it, near appellant's home.

### HEARSAY

■ In his first point of error, appellant contends the trial court erred by refusing to allow him to elicit testimony from Kevin Davis regarding an out-of-court statement made by appellant. Specifically, appellant wanted Davis to testify that on the morning *after* the murder, appellant told Davis he "wished the guy [Tim] was dead." This evidence, appellant contends, is important because it shows that appellant did not know that Tim was already dead.

■ The State argued at trial, and continues to argue on appeal, that the evidence was inadmissible, self-serving hearsay. A defendant's statements are not considered hearsay if they are offered by the State. TEX. R. EVID. 801(e)(2). However, self-serving declarations, or out of court declarations by the defendant, which are offered by the defendant, are inadmissible if offered as proof of the fact asserted. *Allridge v. State*, 762 S.W.2d

146, 152 (Tex.Crim.App.1988). Self-serving declarations, if offered to show the truth of the fact asserted, are not admissible because they are hearsay. *See Price v. State*, 627 S.W.2d 253, 255–56 (Tex.App.—Fort Worth 1982, no pet.).

Appellant acknowledges the general inadmissibility of self-serving declarations, but argues that the statement in question, even if made and offered by the defendant, was not hearsay, because it was not offered to show the truth of the matter asserted. We agree.

■ Appellant did not want to introduce the statement "I wish the guy were dead" to show that he, in fact, wanted Tim dead. Appellant wanted to use the fact that the statement was made the morning after the murder to show that he did not know Tim was already dead. Because the statement in question was not offered to prove the truth of the matter asserted, it was not hearsay. Thus, the trial court erred by excluding it.

■ Nevertheless, we do not believe that the exclusion of this evidence affected a substantial right of appellant. TEX. R.APP.P.44.2(b). A criminal conviction should not be overturned for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim.App.1998).

There was a substantial amount of circumstantial evidence presented in this case. Appellant repeatedly told several people that he wanted to kill Tim. On the day before the murder, he told a co-worker that the problem would be taken care of. Appellant was seen with a shotgun the day before the murder; the murder weapon was a shotgun. A shotgun shell similar to those used in the murder was recovered from appellant's car, along with a detailed map of Carler's house. Appellant showed an inordinate interest in the law of capital murder during the days before the mur-

der. On the day after the murder, appellant was late for work, appeared tired, and had wet shoes. The inside of the car he was driving was also wet, which suggested that it may have been washed down. No one at the Nickels' home saw appellant from the time he went to bed, until he was heard leaving for work the next morning. Finally, Carler testified that she saw the masked intruder, and that based upon his build and the shape of his head, she believed the intruder was appellant.

Although the statement defendant wished to offer may have suggested he did not know Tim had been murdered, a jury could also have believed appellant made the statement in an effort to cover up the murder. The statement also reinforced the fact appellant hated Tim and wished he were dead.

Based on the totality of the circumstances presented, we are fairly assured that the trial court's exclusion of appellant's statement had little, if any, effect on the jury, and did not affect a substantial right of appellant. Accordingly, we overrule point of error one.

## INEFFECTIVE ASSISTANCE OF COUNSEL

■ In point of error two, appellant contends he received ineffective assistance of counsel because his attorney failed to object to: (1) evidence of appellant's post-arrest silence, (2) the prosecutor's comments on appellant's failure to testify, (3) the admissibility of unreliable evidence about the identity of the perpetrator, and (4) counsel's failure to request a limiting instruction as to appellant's extraneous offenses.

■ We follow the test, burden of proof, and standard of review set out in *Jackson v. State*, 877 S.W.2d 768, 770–71 (Tex.Crim.App.1994). We indulge a strong presumption that defense counsel's conduct falls within the wide range of reasonable, professional assistance, *i.e.*, that the challenged action might be considered sound trial strategy. *Id.* at 771. The appellant must overcome this presumption.

*Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist] 1996, no pet.).

■ Although appellant filed a motion for new trial, he did not raise ineffective assistance of counsel in the motion, nor does it appear from the record that a hearing was ever held on the motion. When the record is silent as to counsel's reasons for his actions, we will not speculate as to counsel's trial strategy. *Jackson*, 877 S.W.2d at 771; *Gamble*, 916 S.W.2d at 93. Appellant has not overcome the strong presumption that counsel's actions might have been sound trial strategy. *See Jackson*, 877 S.W.2d at 771–72.

Accordingly, we overrule point of error two.

## MOTION TO SUPPRESS

■ In point of error three, appellant contends the trial court erred by overruling his motion to suppress the evidence that was seized from his car, *i.e.*, the shotgun shell and hand-drawn map of Carler's apartment.

### A. Facts Relevant to Motion to Suppress

Detective David O'Rear of the Huntsville Police Department began investigating the murder on November 11, 1995, the morning after the murder occurred. Appellant was arrested on that afternoon in Cleveland, Texas, where he worked. He had driven Thomas Nickels's Honda Prelude to Cleveland.

Detective O'Rear then began looking for appellant's white Ford Mustang. On November 14, 1995, Detective O'Rear was notified by the Katy Police Department that the Mustang had been located; it was still parked in front of Thomas Nickels's home. Detective O'Rear told the Katy Police to "go ahead and take [the Mustang] into custody to preserve it and in anticipation of us obtaining a search warrant." At the time he asked the Katy Police to seize the Mustang, Detective O'Rear had no information that the car

had "been involved or been used or seen or driven to the Creekwood Apartment crime scene." The Katy police towed the Mustang to the Katy Police Department.

Detective O'Rear then spoke to the District Attorney's office about obtaining a search warrant. However, for reasons not made clear by the record, no warrant was obtained. Instead, Detective O'Rear told the Katy Police to release the car, and, as a part of the release procedure, the Katy Police performed an inventory search.

The inventory of the car turned up a shotgun shell, which matched the spent shells recovered from the crime scene, and a hand-drawn map of Carler's apartment.

## B. Standard of Review

At a suppression hearing, the trial judge is the sole factfinder and may accept or reject any or all of the witness' testimony. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990). This Court must view the evidence in the light most favorable to the trial court's ruling. *Romero*, 800 S.W.2d at 543. Absent a showing of abuse of discretion, the trial court's finding should not be disturbed. *Maddox v. State*, 682 S.W.2d 563, 564 (Tex. Crim.App.1985); *Strickland v. State*, 923 S.W.2d 617, 620(Tex.App.—Houston [1st Dist.] 1995, no pet.)

When a defendant seeks to suppress evidence because of an illegal search that violates the federal and state constitutions, the defendant bears the initial burden to rebut the presumption of proper police conduct. *Russell v. State*, 717 S.W.2d 7, 9 (Tex.Crim.App.1986); *Strickland*, 923 S.W.2d at 620. The defendant meets the burden by proving that the police seized him or performed a search without a warrant. *Russell*, 717 S.W.2d at 9; *Strickland*, 923 S.W.2d at 620. Once the defendant establishes (1) that a search or seizure occurred, and (2) that no warrant was obtained, the burden shifts to the State to produce either evidence of a warrant, or to prove the reasonableness of the search or seizure pursuant to one of the recognized exceptions to the warrant re-

quirement. *Russell*, 717 S.W.2d at 9; *Strickland*, 923 S.W.2d at 620.

Because the State concedes the search was performed without a warrant, the burden rested upon the State to prove the existence of a valid exception. The State argues that the search was done pursuant to a lawful impoundment and inventory.

## C. Law and Analysis

An inventory is permissible under both the fourth amendment of the United States Constitution and article I, section 9 of the Texas Constitution if conducted pursuant to a lawful impoundment. *South Dakota v. Opperman*, 428 U.S. 364, 375–76, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Benavides v. State*, 600 S.W.2d 809, 810 (Tex.Crim.App.1980). Thus, the first issue this Court must decide is whether appellant's car was lawfully impounded.

Impoundment of a car may be lawful under many circumstances. Reasonable cause for impoundment may exist when: (1) the vehicle has been used in the commission of a crime, *Gauldin v. State*, 683 S.W.2d 411, 415 (Tex.Crim.App.1984); (2) an unattended vehicle is abandoned, illegally parked, or otherwise endangering other traffic, *Opperman*, 428 U.S. at 374–75, 96 S.Ct. at 3100; *Benavides*, 600 S.W.2d at 811; (3) the driver is incapacitated and unable to remove the vehicle, *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *Boughton v. State*, 643 S.W.2d 147, 149 (Tex. App.—Fort Worth 1982, no pet.); or (4) the driver is removed from his automobile, placed under custodial arrest, and his property cannot be protected by any means other than impoundment. *Daniels v. State*, 600 S.W.2d 813, 815 (Tex.Crim. App.1980).

In *Benavides*, the police discovered the defendant and his wife in their home; both had been shot, and the defendant's wife was dead. 600 S.W.2d at 810. The police discovered the type of car the defendant drove and began looking for it. The car

was found locked and legally parked about two blocks away from where the defendant and his wife were found. The police impounded the car for "protective custody" and "safekeeping." Before towing the car, the police inventoried its contents and discovered a suicide note incriminating the defendant. *Id.* at 810–11. The Court of Criminal Appeals held the car was unlawfully impounded because (1) there was no evidence that the car was impeding the flow of traffic or a danger to public safety; (2) the vehicle was legally parked in a residential area and locked; (3) while appellant may not have been able to retrieve the car, there may have been someone else who could have done so for him, and (4) there was no reasonable connection between the arrest and the vehicle. *Id.* at 812. In so holding, the court stated, "The mere arrest of a defendant cannot be construed to authorize the seizure of his automobile when the arrest took place two or more blocks away from .the automobile." *Id.*

In *Gauldin*, the police approached the defendant in a bar after they saw him driving a pickup truck, which had been identified as the get-away vehicle in a robbery an hour earlier. 683 S.W.2d at 415. When the defendant admitted he drove the pickup, he was arrested. The police then seized the vehicle and searched it. Although the search was later held to be unlawful because the police did not follow standard inventory procedure, the Court of Criminal Appeals held that the initial impoundment of the vehicle was lawful because (1) the appellant was under arrest; (2) the truck was parked in the parking lot of a bar; and (3) it matched the description of the truck used in the robbery. *Id.*

The State argues that the holding of *Benavides*, which requires a reasonable connection between the arrest and the vehicle, has been expanded to cover situations in which there is a reasonable connection between the crime and the vehicle. We agree. In *Wynne v. State*, 676 S.W.2d 650, 654–55 (Tex.App.—Fort Worth, pet. ref'd), the defendant drove his Cadillac to a rental car lot, rented a car, and committed a shooting while driving the rented car. He then returned the rental car, retrieved his Cadillac, and drove to the airport. *Id.* at 655. The police impounded the Cadillac at the airport. *Id.* The court of appeals held that because the defendant used the Cadillac shortly after the shooting, there was a reasonable connection between the Cadillac and the crime. Thus, the impoundment was reasonable. *Id.*

We find the facts of *Wynne* and the present case quite similar. In *Wynne*, the defendant used a borrowed car to commit the crime, and then made his escape in his own car. Thus, the defendant's own car was subject to impoundment because he used it to commit the crime, *i.e.*, to escape.

In this case, there is also evidence to suggest that appellant used a borrowed car when he committed the crime. When he was arrested, he was driving the Nickels' red Prelude. The inside of the car was wet, suggesting that it had been washed down. Appellant's own white Mustang was soon located at the Nickels' apartment complex. From this evidence, it was reasonable for the police officers to conclude that appellant had driven his Mustang to the Nickels' home, traded cars, and then used the Nickels' car when he committed the crime, so as to avoid being identified by driving his own car to the murder scene. Thus, it was reasonable for the officers to conclude that appellant's own car was used as part of an elaborate plan to avoid being identified at the murder scene. In other words, appellant used his own car to set up an alibi for the offense. Therefore, we conclude that the police officers had probable cause to believe that appellant's white Mustang, regardless of its contents, was used, albeit indirectly, in the commission of the offense. Thus, the seizure of the car was lawful. *Gauldin*, 683 S.W.2d at 415.

The Supreme Court has recently held that police officers may, without a warrant, seize a vehicle if they have probable cause to believe the vehicle itself, as opposed to its contents, is contraband. *Florida v.*

*White,* — U.S. —, — – —, 119 S.Ct. 1555, 1557, 143 L.Ed.2d 748 (1999). In so holding, the Court stated:

> Recognition of the need to seize readily moveable contraband before it is spirited away undoubtedly underlies the early federal laws relied upon in *Carroll.* This need is equally weighty when the automobile, as opposed to its contents, is the contraband that the police seek to secure.

*Id.,* (citations omitted). The Court also noted the warrantless seizure of a vehicle from a public place did not involve any invasion of the defendant's privacy. *Id.*

Although the vehicle seized in the present case was not contraband, it was used in the offense. Thus, the need to seize and preserve the vehicle is equally as important as the need to seize contraband articulated in *White.* Furthermore, as in *White,* the vehicle was seized from a public place.

Therefore, based on the reasoning of *Wynne* and *White,* the seizure of appellant's vehicle was lawful. Once the vehicle was lawfully impounded, the police had the right to inventory it. *Benavides,* 600 S.W.2d at 810.

Accordingly, we overrule point of error three.

We affirm the judgment.