**Rebecca Sue MORRIS, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–99–491–CR.**

Court of Appeals of Texas,
Fort Worth.

June 28, 2001.

---

Scott Palmer, Dallas, for Appellant.

Bruce Isaacks, Crim. Dist. Atty., Pamela Moore Lakatos, Rick Daniel, and Paige McCormick, Asst. Dist. Attys., Denton, and Matthew Paul, State Pros. Atty., Austin, for Appellee.

Panel A CAYCE, C.J.; LIVINGSTON and WALKER, JJ.

## OPINION

WALKER, Justice.

### INTRODUCTION

A jury found appellant Rebecca Sue Morris ("Morris") guilty of possession of a controlled substance with the intent to deliver and assessed her punishment at twenty years' confinement. Morris raises two issues on appeal, challenging the trial court's denial of her motion to suppress evidence and the trial court's finding that she consented to a search of her purse. We will affirm.

### BACKGROUND FACTS

Morris was a passenger in a truck. The truck's driver was arrested for taking part in a drug reversal.[1] Morris's companion, the truck's driver, arrived at an arranged location to purchase drugs from an undercover officer. The driver left the truck and entered another vehicle to exchange his money for the drugs. Morris remained seated in the truck's front passenger seat. The undercover officer gave the "bust" signal, and a nearby arrest team converged on the scene. The arrest team officers removed all occupants, including Morris, from all vehicles associated with the drug transaction. Morris and the occupants of the other vehicles were handcuffed and placed on the ground. Shortly thereafter, a police officer, Officer Col-

---

**1.** A drug reversal is when undercover officers make arrangements to purportedly sell drugs to an individual.

train, searched Morris's purse, which had been left in the truck, and discovered pills, drugs, and drug paraphernalia.

## STANDARD OF REVIEW

■ The appropriate standard of review for a suppression ruling is a bifurcated review. *Bachick v. State*, 30 S.W.3d 549, 551 (Tex.App.—Fort Worth 2000, pet. ref'd). First, we afford almost total deference to a trial court's determination of the historical facts that the record supports, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *State v. Ross*, 32 S.W.3d 853, 856 (Tex.Crim.App.2000) (citing *Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex. Crim.App.1997)); *Bachick*, 30 S.W.3d at 551. We also afford such deference to a trial court's ruling on the "application of law to fact questions" if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 88–89. Next, we review de novo the trial court's application of the law of search and seizure to the facts. *Ross*, 32 S.W.3d at 856.

## TRIAL COURT'S FINDINGS OF FACT

Flower Mound Police Officer Collin Sullivan, Lewisville Police Officer Dan Coltrain, Roanoke Police Officer Robert Olivas, and Morris testified at the suppression hearing. Following the hearing, the trial court issued the following findings of fact:

1. On October 6, 1999, undercover officers with the narcotics unit of the Flower Mound Police Department met with a confidential informant, Mark Vandeventer, at the parking lot at Vista Ridge Movies 12 for a prearranged drug exchange.

2. In addition to Mr. Vandeventer and his female companion, the surveillance team observed a white pickup truck occupied by the Defendant, who was a passenger, and a white male, Roy Lynn Spencer, who was the driver.

3. During the transaction, Mr. Spencer handed a large sum of money to Mr. Vandeventer, who in turn handed it to the undercover officer.

4. After the money was exchanged, a ten-pound brick of marijuana was given to Mr. Spencer.

5. After the marijuana was delivered to Mr. Spencer, an arrest team moved in with weapons drawn and the Defendant, along with all the other occupants of the vehicles involved, was removed from the truck, placed on the ground, and handcuffed.

6. The Defendant had a purse that she attempted to take with her as she was removed from the truck.

7. Officer Coltrain took the Defendant's purse from her and placed it in the truck.

8. The Defendant gave permission to Officer Coltrain to search her purse.

9. Drug paraphernalia and controlled substances were found in the Defendant's purse.

10. The Defendant was arrested after controlled substances and drug paraphernalia were found in her purse.

11. The officers had a reasonable belief that weapons would be present and accessible to the occupants of the vehicles involved in the drug transaction.

12. It is standard police procedure to detain the occupants of all vehicles involved in a drug transaction.

We have carefully reviewed the record of the suppression hearing and conclude that the record supports these fact findings by the trial court. *Guzman*, 955 S.W.2d at 89 ("[A]ppellate courts ... should afford almost total deference to a trial court's determination of the historical facts that the

record supports.").· Accordingly, we give deference to these fact findings by the trial court, but review de novo the trial court's application of the law of search and seizure to these facts. *Id.*

## ARREST OR TEMPORARY DETENTION?

In her first issue, Morris complains that the trial court erred in denying her motion to suppress the evidence obtained from her ˙purse. Morris argues that she was arrested illegally and that the results of the subsequent search were "fruits of the poisonous tree ." We review de novo the trial court's conclusions of law that Morris was not under arrest when she was handcuffed and placed on the ground and that police had a reasonable suspicion to detain Morris for investigation concerning her connection to the drug transaction. *See Guzman,* 955 S.W.2d at 87–88.

■ When a defendant seeks to suppress evidence because of an allegedly illegal arrest, the defendant bears the initial burden to rebut the presumption of proper police conduct. *Russell v. State,* 717 S.W.2d 7, 9 (Tex.Crim.App.1986). The defendant meets this burden by proving that police seized him without a warrant. *See Id.* Once the defendant establishes that a warrantless search or seizure occurred, the burden shifts to the State either to produce evidence of a warrant or to prove the reasonableness of the search or seizure. *Id.*

Here, Morris established that police did not possess a warrant for her arrest or a warrant to search the truck. The burden therefore shifted to the State to show the reasonableness of the search and seizure.

*Id.* The State asserts that Officer Coltrain temporarily detained Morris for an investigative stop and that this stop was reasonable because Officer Coltrain possessed specific articulable facts justifying Morris's temporary detention. Morris, on the other hand, claims that she was under arrest when she was ordered from the truck, placed on the ground, and handcuffed.

■ The first issue we must resolve is whether, under˙ the present facts, Officer Coltrain's initial detention of Morris was a temporary detention or an arrest. *Amores v. State,* 816 S.W.2d 407, 411 (Tex. Crim.App.1991). The standard for distinguishing between an investigative detention and an arrest, however, is not always clear because both constitute seizures. *Josey v. State,* 981 S.W.2d 831, 839 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd). The nature of the detention determines the constitutional parameters which apply to determine its legality. *Amores,* 816 S.W.2d at 411. An investigative detention, to be constitutionally valid, may be founded upon a reasonable, articulable suspicion while an arrest, to pass constitutional muster, must be supported by probable cause. *Id.*

■ An arrest occurs when a person's liberty of movement is restricted or restrained. *Id.* The code of criminal procedure provides that a person is arrested when he has been actually placed under restraint. TEX.CODE CRIM. PROC. ANN. art. 15.22 (Vernon 1977).[2] Numerous cases hold that the mere handcuffing of a suspect does not automatically transform an investigative stop into a full blown arrest. *See, e.g., Rhodes v. State,* 945 S.W.2d 115, 118 (Tex.Crim.App.1997) (holding no

---

**2.** This provision has been called "legislatively obsolete" ˎbecause it was drafted prior to the United States Supreme Court's decision in *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), and fails to distinguish between temporary investigative detentions and arrests. *See Zayas v. State,* 972 S.W.2d 779, 789 (Tex.App.—Corpus Christi 1998, pet. ref'd).

bright—line rule exists providing that handcuffing is always the equivalent of arrest and that Rhodes was not under arrest when officers handcuffed him); *Mays v. State*, 726 S.W.2d 937, 943–44 (Tex.Crim.App.1986), *cert. denied*, 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1020 (1988) (holding officer's handcuffing of two suspects for his own safety did not at that point, under circumstances, constitute an arrest). Rather, whether a detention is an actual arrest or an investigative detention depends on the reasonableness of the intrusion under all of the facts. *Rhodes*, 945 S.W.2d at 118.

■ Further, the opinion of the officer who detains the suspect does not conclusively determine the nature of the detention. *See Rhodes v. State*, 913 S.W.2d 242, 247 (Tex.App.—Fort Worth 1995), *aff'd*, 945 S.W.2d 115 (Tex.Crim.App.1997) (holding defendant was only temporarily detained even though officer testified he was under arrest); *see also Amores*, 816 S.W.2d at 411 (holding defendant had been arrested even though officer testified he was only temporarily detained).

■ An investigative stop, on the other hand, occurs when an officer lacks probable cause to arrest but nonetheless possesses a reasonable suspicion; that is, the officer is able to point to specific, articulable facts that, taken together with rational inferences from those facts, reasonably warrants the detention. *Davis v. State*, 947 S.W.2d 240, 244 (Tex.Crim.App.1997). These facts must amount to more than a mere hunch or suspicion. *Id.* (citing *Williams v. State*, 621 S.W.2d 609, 612 (Tex.Crim.App.1981)). The articulable facts used by the officer must create some reasonable suspicion that some activity out of the ordinary is occurring or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication the unusual activity is related to crime. *Id.* (citing *Meeks v. State*, 653 S.W.2d 6, 12 (Tex.Crim.App.1983)).

■ When officers possess reasonable suspicion justifying a temporary investigative detention, they may use such force as is reasonably necessary to effect the goal of the stop: investigation, maintenance of the status quo, or officer safety. *Rhodes*, 945 S.W.2d at 117. Reasonableness is measured by balancing the nature of the intrusion into an individual's Fourth Amendment interests against the public interest or legitimate government interest at stake. *Zayas*, 972 S.W.2d at 789. Reasonableness must be judged from the perspective of a reasonable officer at the scene, rather than with the advantage of hindsight. *Rhodes*, 945 S.W.2d at 118. Allowances must be made for the fact that officers must often make quick decisions under tense, uncertain, and rapidly changing circumstances. *Id.* However, if the force utilized exceeds that reasonably necessary to effect the goal of the stop, such force may transform an investigative stop into a full blown arrest. *See State v. Moore*, 25 S.W.3d 383, 385 (Tex.App.—Austin 2000, no pet.) (holding although officer possessed reasonable, articulable facts justifying an investigative stop, handcuffing of suspect constituted excessive force under the circumstances and transformed detention into an arrest, for which the officer did not have probable cause); *Gordon v. State*, 4 S.W.3d 32, 37 (Tex.App.—El Paso 1999, no pet.) (holding "[i]n the absence of any proof in the record to demonstrate the necessity for these actions [i.e., handcuffing the suspect and placing him in the back of the police car], what may have been a valid investigative detention at the outset became an arrest

unsupported by probable cause").[3]

To determine the reasonableness of an investigative detention, we apply the guidelines set out by the United States Supreme Court in *Terry v. Ohio:* (1) whether the officer's action was justified at its inception; and (2) whether it was reasonably related in scope to the circumstances that initially justified the interference. *Davis,* 947 S.W.2d at 242 (citing *Terry,* 392 U.S. at 19–20, 88 S.Ct. at 1879). An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Id.* at 244. In evaluating the reasonableness of an investigative detention, we must apply an objective standard by asking whether, in light of the officer's experience, the facts available would justify a person of reasonable caution in believing the action taken was appropriate. *Id.* at 242–43, 88 S.Ct. 1868. In short, reasonable suspicion requires that "there is something out of the ordinary occurring and some indication that the unusual activity is related to crime." *Id.* at 244, 88 S.Ct. 1868. We look at the totality of the circumstances to make the reasonable suspicion determination. *Loesch v. State,* 958 S.W.2d 830, 832 (Tex.Crim.App.1997).

Here, the drug reversal occurred during daylight, at approximately 5:00 p.m. Officer Sullivan, the undercover officer, contacted detectives with the Flower Mound Police Department, as well as detectives with the North Central Narcotics Task Force to provide backup during this reverse drug transaction. He estimated a total of ten to twelve officers appeared at the scene to serve as backup. Officer Sullivan testified that these types of transactions are dangerous for undercover officers because they are "dealing with a person of unknown background" and are not sure whether just the buyer will show up to purchase the drugs or whether additional parties will come.

Officer Coltrain testified that he was called and asked to serve as "backup" for a drug reversal that was about to occur. He was told that the reversal involved three vehicles parked in the Vista Ridge Mall parking lot: a black truck belonging to the undercover officer, Officer Sullivan; a white pickup; and a maroon Chevrolet. When Officer Coltrain arrived at the scene with Officer Olivas, the reversal was already in progress. Officer Coltrain and Officer Olivas were assigned to detain the occupants of the white truck, after Officer Sullivan gave the bust signal.

Officer Coltrain saw the bust signal, ran to the passenger side of the white truck, pointed his gun "in the vicinity" of Morris, identified himself as a police officer, ordered Morris to put her hands above her head, and ordered her to get out of the truck. Morris cooperated. Officer Coltrain then ordered Morris to lay on the ground and put her hands behind her back. Again Morris cooperated, and Officer Coltrain handcuffed her hands behind her back. Morris was handcuffed and was laying face down on the ground for five to ten minutes before Officer Coltrain asked for permission to search her purse.

Officer Olivas saw the bust signal, exited his vehicle, drew his weapon, pointed it at the occupant of the white pickup, and ran up to that vehicle. He could hear Officer Coltrain yelling, "police, police, get out of the car."

---

**3.** In both *Moore* and *Gordon,* the trial courts granted the defendants' motions to suppress. Thus, the trial courts' implied or express fact findings, to which the appellate courts deferred under the *Guzman* standard, supported suppression of the illegally seized evidence. In this case, the trial court denied Morris's motion to suppress.

Both Officer Coltrain and Officer Olivas testified that Morris was not free to leave while she was handcuffed laying on the ground but that she was not under arrest. They both testified that it is "standard procedure" in drug reversals to temporarily detain the occupants of all the vehicles involved in the transaction because of concerns for officer safety and to ensure that evidence is not destroyed. Officer Coltrain also testified:

Q. Okay. We got there, identified ourselves as police officers, had them raise their hands so we could see where their hands were. I opened the side of—the passenger door, had her get out of the truck, put her on the ground, secured her with handcuffs, and then set her to the side to make sure everything was clear.

Q. At this point in time, did you have reason to believe that there could be weapons in that vehicle?

A. Sure.

Q. And why do you believe that?

A. Past experience.

Q. What do you mean by past experience?

A. We've dealt with people before doing these type of deals who've had weapons in the vehicle.

■ We hold that Morris's proximity to the transaction, her connection to one of the individuals involved in the drug transaction, and her connection to a vehicle used in the drug transaction, when combined with the officers' experiences with multi-party drug reversal transactions, warranted the intrusion of a temporary detention. The officers *knew* that a reverse drug transaction—an illegal activity on the part of the drug buyer—had been arranged. The officers' articulable facts that they were dealing with an unknown drug buyer in this transaction, that often times additional persons accompanied the

buyers to the scene, and that frequently the people involved possessed weapons created a reasonable suspicion that Morris could be armed and should be seized and detained for officer safety. *Rhodes,* 945 S.W.2d at 117–18; *see also Carmouche v. State,* 10 S.W.3d 323, 327 (Tex.Crim.App. 2000) (recognizing that in the context of a *Terry* frisk, a police officer's reasonable belief that a suspect is armed and dangerous may be predicated on the nature of the suspected criminal activity).

■ Having determined that a temporary investigatory detention was reasonable, we next address Morris's contention that the force utilized by Officer Coltrain when he handcuffed her and placed her on the ground at gunpoint exceeded the force reasonably necessary to effect the goal of any investigative stop and constituted a full-blown arrest. Morris also argues that the police never questioned her, asked her if she possessed any weapons, or conducted a pat-down search and that, therefore, the stop was clearly not for investigative purposes.

In support of her contention that she was under arrest when Officer Coltrain ordered her from the truck at gunpoint, placed her on the ground, and handcuffed her, Morris relies upon *Amores,* 816 S.W.2d at 411. In *Amores,* a police officer responded to a "burglary in progress" call from an apartment complex indicating a black male was loading a box into a car. *Id.* at 410. The officer arrived at the scene within one minute of the call and observed Amores, a black male, sitting in a parked car. *Id.* As the officer entered the complex parking lot, Amores began to drive away. *Id.* The officer blocked Amores's vehicle with his police car, drew his gun and pointed it at Amores, ordered Amores out of his vehicle, and made him lay on the ground with his hands behind

his back, and told Amores that he would shoot him if he did not follow directions. *Id.* at 411–12. The court of criminal appeals held that "[t]hese facts are sufficient to demonstrate that appellant had been restricted or restrained in his liberty to such a degree as to constitute an arrest." *Id.* at 412. The court noted that although the detaining officer characterized Amores's stop as an investigative detention, he did not conduct any investigation. *Id.* Morris argues that she, just like Amores, was restrained in her liberty to the extent that she was arrested and that Officer Coltrain, like the officer in *Amores*, failed to conduct any investigation. Thus, she argues that she was illegally arrested without probable cause and the subsequent search was "fruit of the poisonous tree."

We hold that Officer Coltrain's handcuffing of Morris was a reasonable use of force in the context of her stop. This case, unlike *Amores*, involved multiple parties and multiple vehicles. The danger to officers, like the undercover officers involved in this transaction, increases exponentially when additional parties and vehicles are present. This case, unlike *Amores*, involved an arranged reverse drug transaction: officers were *certain* that criminal activity was intended to occur. In *Amores*, the officer was acting on a reported call, not upon information provided by an undercover officer engaged in a drug reversal transaction. *Id.* at 410. The officer safety concerns present in this case were simply not present in *Amores*.

Officers Coltrain and Olivas both testified that, based on their experience, reverse drug transactions are frequently volatile situations because of the amount of money involved. They explained that standard procedure dictates the securing of all occupants of all involved vehicles for officer safety and preservation of evidence. Further, both Morris and Officer Coltrain

testified that she was handcuffed only five to ten minutes. From the perspective of Officers Coltrain and Olivas at the scene, and allowing for the fact that these officers were required to make quick decisions under the tense circumstances of a reverse drug transaction involving risk to undercover officers, the force they exercised was reasonable. Balancing the nature of the intrusion in the present case against the public interest in officer safety and effective drug "sting" operations like this one, we cannot say that the force exercised by Officers Coltrain and Olivas was excessive to the extent that it transformed Morris's stop into a full blown arrest.

■ Morris argues that she was, in fact, arrested because officers failed to question her or to conduct a pat-down search. We disagree. Officers Coltrain and Olivas both testified that the purpose of Morris's temporary detention was officer safety and preservation of evidence, not investigation of additional crimes. They accomplished this purpose by securing Morris, viewing the interior of the truck, and asking for permission to search a purse in the truck. No verbal questions were necessary to effectuate the purpose of Morris's temporary detention. We hold that the officers' failure to verbally question Morris did not transform her temporary detention into an arrest.

Because Morris was not arrested before her purse was searched, the results of that search are not "the fruit of the poisonous tree ." We overrule Morris's first issue.

## CONSENT TO SEARCH

■ In her second issue, Morris claims that the trial court abused its discretion when it found that Morris voluntarily consented to the search of the purse. The Fourth Amendment guarantees people the right to be "secure in their persons, houses, papers, and effects, against unrea-

sonable searches and seizures." U.S. CONST. amend. IV. As a result, searches made without warrant are generally per se unreasonable. *Mendoza v. State*, 30 S.W.3d 528, 531 (Tex.App.—San Antonio 2000, no pet.). When a search without a warrant is made, the State bears the burden to show that the search falls within one of the narrow exceptions to the warrant requirement in order for the search to be constitutionally permissible. *Id.*

■ An exception to the warrant requirement is a search conducted by consent. *Id.* (citing *Meeks v. State*, 692 S.W.2d 504, 509 (1985)). To show that the search was made with the property owner's consent, the state must prove by clear and convincing evidence, based on the totality of the circumstances, that the defendant gave consent freely and voluntarily.[4] *Id.; see also Reasor v. State*, 12 S.W.3d 813, 818 (Tex.Crim.App.2000). If consent is obtained through duress or coercion, whether actual or implied, that consent is not voluntary. *Allridge v. State*, 850 S.W.2d 471, 493 (Tex.Crim.App.1991), *cert. denied*, 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). Voluntariness is a question of fact to be determined from the totality of the circumstances. *Carmouche*, 10 S.W.3d at 331; *see also Reasor*, 12 S.W.3d at 818; *White v. State*, 21 S.W.3d 642, 645 (Tex.App.—Waco 2000, pet. ref'd).

■ Testimony by law enforcement officers that no coercion was involved in obtaining the consent is also evidence of the consent's voluntary nature. *Martinez*

*v. State*, 17 S.W.3d 677, 683 (Tex.Crim. App.2000). A search is valid if, in light of all the circumstances, the officers' belief that they had consent to search was objectively reasonable. *Mendoza*, 30 S.W.3d at 531; *see also Vargas v. State*, 18 S.W.3d 247, 253–54 (Tex.App.—Waco 2000, pet. ref'd) (discussing officer's objectively reasonable conclusion that defendant consented to general search of interior of vehicle).

■ At a suppression hearing, the trial court is the exclusive trier of fact and judge of the credibility of the witnesses and the weight of their testimony. *Green v. State*, 934 S.W.2d 92, 98 (Tex.Crim.App. 1996), *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997); *McAllister v. State*, 34 S.W.3d 346, 350 (Tex.App.—Texarkana 2000, pet. ref'd). We are required to defer to the trial court's fact findings when those findings are supported by the record and turn on the evaluation of credibility and demeanor. *Ross*, 32 S.W.3d at 856–57.

■ On appeal, Morris asserts that her consent to search her purse was not *voluntary*.[5] The record reflects that Morris testified she *did not consent* to the search of her purse. Morris testified:

Q. Did the officer ask you to raise your hands?

A. Yes.

Q. Get out of the car?

A. Uh-huh.

Q. Did you cooperate with him?

A. Yes.

---

4. Although the federal constitution only requires the State to prove the voluntariness of consent by a preponderance of the evidence, the Texas Constitution requires the State to show by clear and convincing evidence that the consent was freely given. *Carmouche*, 10 S.W.3d at 331 (citing *State v. Ibarra*, 953 S.W.2d 242, 245 (Tex.Crim.App.1997)).

5. Morris also claims that any consent to search was part of an *unMirandized* custodial interrogation because she was under arrest when she was removed from the truck at gunpoint, ordered to lay on the ground, and handcuffed. We have determined, in addressing Morris's first issue, that she was not under arrest at this point. Consequently, we decline to address this argument by Morris.

Q. Did he ever ask you if he could search your purse?

A. No.

. . . .

Q. . . . . What happened next after you were laid out on the pavement?

A. I was still on the pavement handcuffed, and it was, like, maybe five or ten minutes. I don't really know the length of time. That's when I noticed they were in the truck going through the stuff in the truck because he raised up a small purse and asked me if it was mine, and I said no. And he said, well, this—I said, the big purse is mine. And he said, well, this was in the big purse.

Officer Coltrain, on the other hand, testified that he asked Morris for permission to search her purse "[w]hen the situation was settled and all the suspects from all the vehicles were detained." He said that Morris was sitting up by the truck at that time. Officer Coltrain testified that he asked Morris if he could search the purse and that she said "okay."

The trial court chose to believe the testimony of Officer Coltrain and to disbelieve Morris's testimony. *See Martinez v. State,* 17 S.W.3d 677, 683 (Tex.Crim.App. 2000) (holding trial court was free to disregard testimony of appellant's mother and sister that appellant's mother did not consent to the search of appellant's bedroom and to believe testimony of police that appellant's mother did consent to search); *White,* 21 S.W.3d at 646 (holding trial court could choose to believe testimony of police officer that appellant's wife consented to search over testimony of appellant's wife who claimed that she never consented to search).

Assuming Morris's claim in the suppression hearing that she did not consent to the search of her purse fairly encompasses her claim on appeal that her consent was not voluntary, we will address the voluntariness issue. *See Martinez,* 17 S.W.3d at 683. The record, viewing the historical facts in the light most favorable to the trial court's ruling, shows that Officer Coltrain and the other backup officers secured the scene by removing the occupants of all the vehicles involved, placing them on the ground, and handcuffing them. Even Officer Sullivan, the undercover officer, was placed on the ground and handcuffed. Once the scene was secure, Officer Coltrain asked Morris if he could search her purse. At this time, Officer Coltrain had reholstered his gun, and Morris was sitting near the truck. Nothing in the record suggests duress or coercion. The totality of the circumstances supports the trial court's determination that Morris voluntarily consented to the search of her purse. We overrule Morris's second issue.

## CONCLUSION

Having overruled Morris's issues, we affirm the judgment of the trial court.