

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

## No. 02-18-00451-CR

———————————————

RANDY MANYVORN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from County Criminal Court No. 8
Tarrant County, Texas
Trial Court No. 1470804

---

Before Pittman, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

This is a search-and-seizure case wherein Appellant Randy Manyvorn was convicted of driving while intoxicated. In a single issue, he complains that the trial court erred in denying his motion to suppress because the trial court's finding of reasonable suspicion was not supported by sufficient facts. We affirm the trial court's judgment.

## II. BACKGROUND

### A. Search and Seizure

During the evening of August 1, 2015, Pantego Police Officer Brian Martin determined by radar that a silver Acura sedan was traveling the opposite direction at a speed of eighty-seven miles per hour in a zone having a posted speed limit of forty-five miles per hour. The dash camera of Martin's patrol car shows that Martin stopped in the left lane at a red traffic signal, and after a vehicle approached from the opposite direction and continued past him, Martin activated his vehicle's emergency lights and siren, turned to follow, and then stopped behind a silver Acura vehicle at an intersection displaying a red traffic signal. The recording shows that the sedan driver had stopped the vehicle past the stop line with the sedan's rear tires located in the crosswalk and the front end of the vehicle in the intersection. When the traffic signal turned green, the driver proceeded through the intersection and drove for a short time

before stopping. While calling in the plate number, Martin specified that the silver Acura had been traveling in excess of eighty-seven miles per hour.

The dash camera video showed that after Martin initiated the stop, Officer Clayton Wolf of the Dalworthington Gardens Police Department responded to Martin's call for backup. Martin asked the driver, Manyvorn, why he was traveling eighty-seven miles per hour, and Manyvorn stated that he was going home. When Martin told Manyvorn that he could not understand why he was traveling eighty-seven miles per hour in a forty-five mile per hour zone, Manyvorn stated, "Okay. I understand that." Manyvorn informed Martin that he was going home from a Texas Rangers game where he drank five 16-ounce beers. Martin administered standardized field sobriety tests and determined that Manyvorn was intoxicated. When Martin asked Manyvorn to identify his level of intoxication using a scale of zero-to-five, Manyvorn responded, "Seven." Martin informed Manyvorn that he was under arrest for driving while intoxicated.

In his affidavit in support of the search warrant for Manyvorn's blood, Martin noted that he initiated the stop because Manyvorn was driving eighty-seven miles per hour on a road where the posted speed limit is forty-five miles per hour.[1] The affidavit also contains a statement that at the time of the stop, Martin "believed that these facts, among others, possibly indicated that the suspect was committing the

---

[1]Martin's affidavit in support of the search warrant was admitted as evidence "for purposes of the record only" during the suppression hearing.

following Transportation Code violations: Driving While Intoxicated[.]" Martin added that Manyvorn had informed him that he "always drives 87 mph in a 45 mph zone" and had "consumed "[five to six 16-ounce] [b]eers at the Ranger Baseball Game[,]" and when Martin asked Manyvorn to identify "on a scale of '0-5' of intoxication, where do you [f]eel your [l]evel of intoxication is[,] Manyvorn said, '7'." Martin noted that, by his silence, Manyvorn had refused to provide a requested sample of breath or blood. After securing a search warrant, a sample of Manyvorn's blood was obtained and tested. Manyvorn's blood sample registered a blood alcohol concentration of .105.

**B.     Motion to Suppress**

Manyvorn was charged with the offense of driving while intoxicated. *See* Tex. Penal Code Ann. §§ 49.01(2)(B), 49.04. Prior to trial, Manyvorn filed a motion to suppress evidence on the basis that Martin lacked reasonable suspicion to stop his vehicle for speeding, lacked probable cause to arrest him, and had illegally and improperly obtained his blood which was the primary incriminatory evidence to be used against him.

The trial court heard the suppression motion on the day of trial before empaneling the jury. Wolf and Pantego Police Department Investigator Shelli Godbold testified during the suppression hearing and at trial. Martin, who was no longer working with the police department, was not available on the day of trial and was traveling out of state.

4

Godbold, a twenty-year police veteran, authenticated Martin's dash camera recording, which was published to the trial court. Godbold had not been present during the stop but had watched Martin's dash camera recording and observed that a vehicle in the far left lane was travelling faster than the limit established in the forty-five mile per hour zone. Godbold did not know how fast the vehicle had been traveling and was unable to testify regarding the radar equipment used or Martin's training on the use of the equipment. However, she agreed that the driver of the sedan had committed a traffic violation by stopping "in the intersection across the crosswalk." Godbold understood that Martin had stopped the vehicle because of the speeding violation rather than the "stop-line violation" and agreed that the dash camera recording included no comment or discussion regarding Manyvorn's failure to stop at the stop line. Godbold was unable to discern the color of the speeding vehicle as it passed Martin before he activated his lights and siren. From the recording, Godbold could not identify whether any of the several cars at the stop signal was the vehicle that Martin had observed speeding, and she had no personal knowledge of the events of August 1, 2015. She agreed that she could not identify a reason for Martin to initiate the stop other than for the alleged speed-limit violation but stated that the stop-line violation provided an objectively reasonable basis for stopping the vehicle. Based on the recorded conversations between Martin and Manyvorn, Godbold believed the correct vehicle was stopped but agreed that she did not hear Manyvorn admit on the recording that he had been speeding.

5

Wolf, a certified peace officer for more than eleven years, identified Manyvorn as the person involved in the traffic stop. Wolf confirmed that the posted speed limit in the area where Manyvorn was stopped is forty-five miles per hour and agreed that the dash camera recording accurately depicted what had occurred. When Wolf arrived on the scene of the stop, he did not know the basis of Martin's reasonable suspicion for the stop or whether Martin had established probable cause for an arrest. It was during the stop that Wolf learned Manyvorn had been driving the sedan at a speed that exceeded the posted limit. After reviewing the dash camera recording, Wolf described the color of the speeding vehicle as being light, such as white or silver, but not dark. Wolf admitted that he was unable to identify which of the vehicles at the stop light was the speeding vehicle depicted on the dash camera video and could not confirm the speed of the vehicle while it was traveling. While on scene, Wolf did not recall whether there was any issue involving Manyvorn's failure to stop at the stop line at the traffic-signal intersection.

The trial court indicated from the bench that it would grant Manyvorn's suppression motion. At the State's urging, the trial court agreed to recess and consider one or more cases tendered by the State in support of its challenge to the court's initial determination that Manyvorn's seizure had occurred when Martin first activated his emergency lights. The State noted that no seizure occurs until after there is a demonstrated yield to authority and argued that in this case no seizure occurred until Manyvorn had moved his vehicle to the side of the road. After returning from

6

its recess, the trial court denied the motion to suppress, declaring that although there was no evidence of reasonable suspicion to stop Manyvorn's vehicle for a speeding violation, reasonable suspicion existed to stop Manyvorn's vehicle for stopping past the stop line, which is an independent violation of the Texas Transportation Code. *See* Tex. Transp. Code Ann. § 544.007(d).

## C.    Trial

After proceeding to trial, the jury convicted Manyvorn of the offense of driving while intoxicated. Manyvorn elected to have the trial court assess punishment. The trial court assessed punishment at confinement for ninety days, suspended the sentence, and placed Manyvorn on community supervision for fifteen months.

## D.    Findings of Fact and Conclusions of Law

At Manyvorn's request, the trial court entered written findings of fact and conclusions of law. The trial court determined:

1.    Defendant, Randy Manyvorn[,] was stopped by Officer Martin of Pantego Police Department on August 1, 2015. Officer Wolf of Dalworthington Gardens Police Department served as backup on this traffic stop. Investigator Godbold is an investigator with Pantego Police Department's CID division and later became familiar with the case.

2.    Investigator Godbold and Officer Wolf both testified in the Motion to Suppress and were found to be credible witnesses.

*State's Exhibit 2-Dash Camera*

3.    Officer Martin's vehicle was equipped with a dash camera mounted to the windshield.

7

4. The dash camera automatically turns on when an officer activates the overhead lights. The camera will also kickback one minute to record the minute leading up [to] the activation of the lights. The dash camera is capable of making accurate recordings.

5. The dash camera footage is kept on a secured system that does not allow for the videos to be altered or tampered.

6. The dash camera videos are made in real time as the events captured occur. The making and keeping of the dash camera footage is a regular business practice of the Pantego Police Department.

7. Investigator Godbold is a custodian of records for the dash camera videos and a qualified witness to testify to the business practice of the records being created, maintained, and the integrity preserved.

8. Officer Wolf confirmed that the video was an accurate depiction of the events that occurred during the August 1, 2015 traffic stop of Defendant.

*Traffic Stop*

9. The Defendant's silver Acura was stopped on a section of Highway 303 where the speed limit is 45MPH.

10. Based on the training and experience of Officer Wolf and Investigator Godbold, a vehicle resembling the Defendant's silver Acura was clearly traveling in excess of 45MPH. The speeding vehicle was light colored, either white or silver.

11. The vehicle clearly seen speeding on [State's] Exhibit 2 was traveling the opposite direction of Officer Martin. Consequently, a U-turn was required to stop the vehicle and the camera inevitably lost sight of the speeding vehicle for a brief moment in time.

12. Officer Martin made a U-turn and simultaneously activated his overhead lights. He caught up to Defendant's vehicle at a stop light. There were three or four total vehicles stopped at this stop light.

13. While at the stop light, Defendant failed to stop at the solid white stop line, but rather stopped in the crosswalk with the vehicle sticking out into the intersection.

14. Defendant did not yield to the overhead lights and pull over until after he drove through the intersection and continued for a short distance.

15. Officer Martin turned his overhead lights on at 1:00 on State's exhibit 2 and pulls behind Defendant at the stop light at 1:33. At 1:42, the stop light turns green and Defendant drives for some distance before pulling over for the traffic stop at 2:06 on the Dash Camera video in State's exhibit 2.

*Conclusions of law*

16. In order to conduct a traffic stop, an officer needs reasonable suspicion. Reasonable suspicion exists when the officer has "specific articulable facts that, when combined with the rational inferences from those facts, would lead him to reasonably conclude that a particular person actually is, has been, or will be engaged in criminal activity." *Ford* v. *State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

17. The reasonable suspicion analysis looks solely at whether an objective basis for a stop exists. *Ford*, 158 S.W.3d at 492.

18. There was reasonable suspicion to stop the silver Acura driven by the Defendant for stopping [past] the stop line at the crosswalk in violation of T[ransportation] C[ode §] 544.007(d).

19. There was reasonable suspicion to believe a vehicle was speeding in violation of T[ransportation] C[ode §] 545.351.

20. Defendant was not seized until he pulled over and yielded to Officer Martin's show of authority. *See California* v. *Hodari D.*, [499 U.S. 621, 626, 111 S. Ct. 1547, 1550–51 (1991)].

9

## III. DISCUSSION

On appeal, Manyvorn contends the trial court should have granted his motion to suppress for lack of reasonable suspicion to stop his vehicle for speeding and for stopping past the stop bar and should have suppressed evidence obtained as a result of the stop. Manyvorn emphasizes that Martin failed to appear and testify at trial, did not otherwise identify in his written sworn report any traffic violation other than speeding as a basis for forming reasonable suspicion to detain him, nor informed Wolf of any basis for forming reasonable suspicion for the detention.[2] The State counters that the evidence before the trial court at the suppression hearing supported a reasonable inference that Martin had reasonable suspicion to stop Manyvorn for a traffic violation, including the stop-line violation.

### A. Standard of Review and Applicable Law

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of

---

[2]Manyvorn included Martin's sworn report as an exhibit to his motion for new trial and motion in arrest of judgment. The report was not admitted in evidence during the hearing on the motion to suppress.

the witnesses' credibility and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). Therefore, we defer almost totally to the trial court's rulings on (1) questions of historical fact, even if the trial court determined those facts on a basis other than evaluating credibility and demeanor, and (2) application-of-law-to-fact questions that turn on evaluating credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the witnesses' credibility and demeanor, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53. We review a trial court's videotape-based determination of historical facts under the *Guzman* deferential standard. *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006) (holding that the deferential standard of review in *Guzman* applies to a trial court's determination of historical facts when that determination is based on a videotape recording admitted into evidence at a suppression hearing).

Stated another way, when reviewing the trial court's ruling on a suppression motion, we must view the evidence in the light most favorable to the ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings.

11

*Kelly*, 204 S.W.3d at 818–19.  We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling.  *Id.* at 818.  Even if the trial court gave the wrong reason for its ruling, we must uphold the ruling if it is both supported by the record and correct under any applicable legal theory.  *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003).

The Fourth Amendment protects against unreasonable searches and seizures by government officials.  U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24.  A defendant seeking to suppress evidence on Fourth Amendment grounds bears the initial burden to produce some evidence that the government conducted a warrantless search or seizure that he has standing to contest.  *State v. Martinez*, 569 S.W.3d 621, 623-624 (Tex. Crim. App. 2019) (quoting *Russell v. State*, 717 S.W.2d 7, 9 (Tex. Crim. App. 1986), *disavowed in part on other grounds by Handy v. State*, 189 S.W.3d 296, 299 n.2 (Tex. Crim. App. 2006)); *Handy*, 189 S.W.3d at 298–99; *see, e.g.*, *Rawlings v. Kentucky*, 448 U.S. 98, 104–05, 100 S. Ct. 2556, 2561 (1980).  Once the defendant does so, the burden shifts to the State to prove either that the search or seizure was conducted pursuant to a warrant or, if warrantless, was otherwise reasonable.  *Martinez*, 569 S.W.3d at 624 (quoting *Russell*, 717 S.W.2d at 9); *Amador*, 221 S.W.3d at 672–73.

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts.  *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); *Carmouche v.*

*State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). An officer conducts a lawful temporary detention when he reasonably suspects that an individual is violating the law. *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010); *Ford*, 158 S.W.3d at 492. Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492. This is an objective standard that disregards the detaining officer's subjective intent and looks solely to whether the officer has an objective basis for the stop. *Id.*; *see also State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013) ("If the facts that the officer knows 'at the inception of the detention' support a finding of reasonable suspicion or probable cause to conduct a traffic stop, then it is irrelevant that the officer subjectively decided to stop the driver for a bad reason.").

### B. Manyvorn's Contentions

Manyvorn asserts that a traffic stop based on information not known to or noticed by an officer cannot support an initial detention, and that information that the officer either acquired or noticed after a detention or arrest cannot be considered in determining the existence of reasonable suspicion. *See Duran*, 396 S.W.3d at 569. He argues that Martin, who was alone at the time of the investigative traffic stop, did not have sufficient specific and articulable facts to establish reasonable suspicion to initially stop him for speeding or for any other reason and that Martin did not identify

13

to Wolf any basis for forming reasonable suspicion. Because Martin did not testify at trial, Manyvorn contends the testimony of Wolf, who viewed Martin's dash camera recording in preparation for trial, was insufficient to establish the existence of a reasonable suspicion to justify Martin's initial stop based on the stop-line traffic violation, which formed the basis of the trial court's denial of his suppression motion.

Moreover, Manyvorn argues that because Martin never identified the stop-line violation as a basis for his stop, the evidence did not establish that Martin knew or was aware of the subsequent stop-line violation at the time that he stopped Manyvorn, and for this reason, the trial court should have granted the motion to suppress evidence that had been obtained as a result of the stop. Manyvorn prays that this court grant him relief, remand the case, and order suppression of the stop.

## C. Analysis

We find Manyvorn's reliance on *Duran* under these facts to be unpersuasive. In that case, the detaining officer testified during the suppression hearing that after he observed Duran make a right turn from a far left lane, he turned to follow Duran. *Duran*, 396 S.W.3d at 567. The officer stated that he observed Duran's vehicle briefly cross the center yellow stripe on the road, activated his emergency lights and siren to make a traffic stop, and after performing an investigation arrested Duran for driving while intoxicated. *Id.* The trial court found that the center-stripe violation played no part in the officer's decision to stop Duran and that the officer was wrong about Duran's turn being unlawful and granted Duran's motion to suppress. *Id.* at 568. The

14

State appealed the trial court's ruling. *Id.* The court of appeals reversed and observed that the trial judge had focused on the officer's subjective reasons for making the stop. *Id.*

After granting Duran's petition for discretionary review, the court of criminal appeals noted that a rationalization for a stop cannot be made based on information learned after the stop. *Id.* at 569–70. As an example, the court observed that if an officer believes a driver is speeding but later determines that he was wrong about the occurrence of the offense, the officer cannot later justify the stop by showing that a recording shows that the driver's vehicle had a faulty tail light that the officer had not noticed before the stop. *Id.* at 570. The court of criminal appeals reaffirmed that information an officer acquires after a detention or arrest cannot be considered in examining a stop. *Id.* However, the court also reiterated that a fact known to an officer before a stop, such as an observation that a driver is not wearing a seat belt, would support probable cause to stop the driver. *Id.* The court further observed:

> If the facts that the officer knows "at the inception of the detention" support a finding of reasonable suspicion or probable cause to conduct a traffic stop, then it is irrelevant that the officer subjectively decided to stop the driver for a bad reason. A good reason did exist, and the officer knew of that good reason at the time he made the stop. *Id.*

Ultimately, in *Duran*, the court determined that whether the officer saw Duran's center-stripe violation before the officer detained Duran was a fact to be decided by the trial judge rather than the courts of appeals or the court of criminal appeals, which

"must view the trial judge's factual findings in the light most favorable to [the trial judge's] ultimate conclusion." *Id.* at 571–72.

An investigative detention occurs when a person yields to the police officer's show of authority under a reasonable belief that he is not free to leave. *Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010) (citing *Johnson v. State*, 912 S.W.2d 227, 235 (Tex. Crim. App. 1995)); *see also Hodari D.*, 499 U.S. at 626, 111 S. Ct. at 1550–51 (holding that a police pursuit in attempting to seize a person does not amount to a "seizure" within the meaning of the Fourth Amendment). Here, the trial court determined, and the evidence shows, that Manyvorn did not pull to the side of the road until after the stop-line violation.

As Manyvorn notes, the State was required to show that Martin, at the time of detention, had specific articulable facts establishing reasonable suspicion to investigate further. *Martinez v. State*, 348 S.W3d 919, 923 (Tex. Crim. App. 2011). However, at a suppression hearing, the State is not required to show that a crime occurred prior to the officer's investigative stop; rather, "it must elicit testimony showing sufficient facts to prove that reasonable suspicion existed that a particular person has engaged in, or soon will be engaging in, criminal activity." *Id.*

As noted, Martin was not present to testify during the suppression hearing. Relying on an unpublished opinion from this court, the State contends that when a detaining officer is not available to testify at trial, specific articulable facts known to the officer at the time of the stop to establish reasonable suspicion can be established

16

by a video recording and may support a finding that the detaining officer had reasonable suspicion to stop the suspect. *See Johnson v. State*, No. 02-04-497-CR, 2005 WL 3244272, at *2 (Tex. App.—Fort Worth Dec. 1, 2005, pet. ref'd) (mem. op., not designated for publication). We agree.[3]

In *Johnson*, the detaining officer, who initiated a stop of Johnson's vehicle and ultimately arrested Johnson for the offense of driving while intoxicated, died before trial. *Id.* at *1. Johnson sought to suppress the officer's dash camera recording of the stop. *Id.* At trial, the State authenticated the officer's dash camera recording, and the trial court ruled that portions of the recording were admissible.[4] *Id.* The dash camera recording showed the officer following Johnson's vehicle, which was committing traffic violations by repeatedly swerving into adjoining lanes. *Id.* The recording showed the officer turn on his lights and initiate a stop. *Id.* After the officer conducted field sobriety tests, the recording documented that Johnson had failed the tests. *Id.* After being convicted of the offense of driving while intoxicated, Johnson argued that the trial court's denial of his suppression motion was improper because the dash camera recording alone was insufficient to prove that the officer had

---

[3]We also observe that an officer has probable cause to stop and arrest a driver if he sees the driver commit a traffic offense. *State v. Gray*, 158 S.W.3d 465, 469 (Tex. Crim. App. 2005); *see State v. Ballman*, 157 S.W.3d 65, 70 (Tex. App.—Fort Worth 2004, pet. ref'd).

[4]The *Johnson* trial court suppressed portions of the recording of "events that occurred in the intoxilyzer room" after the arrest. 2005 WL 3244272, at *1.

17

reasonable suspicion to initiate the stop. *Id.* We held that the recording established reasonable suspicion to support the detaining officer's stop of Johnson to investigate whether Johnson had committed the offense of driving while intoxicated, and that after Johnson failed the field sobriety tests, the officer possessed probable cause to arrest him for that offense. *Id.* at 2. Because the trial court did not err in denying Johnson's motion to suppress, we affirmed the trial court's judgment, and the court of criminal appeals subsequently refused Johnson's petition for discretionary review. *Id.*

Here and in *Johnson*, the detaining officers were not present to testify regarding the bases for the stop. *Id.* at *1. Other than the traffic violation shown on the recording, the only fact in this case that appears to differ from those in *Johnson* is that, unlike that case, here two officers who were not present when Martin initiated his stop of Manyvorn subsequently viewed Martin's dash camera recording and testified at the suppression hearing. Godbold testified that the recording showed Manyvorn's stop-line traffic violation while Wolf did not recall whether there was any issue regarding the stop-line violation.

Apparently, no officer testified in *Johnson*. That difference does not render our *Johnson* analysis inapplicable to the present facts nor does it defeat the trial court's conclusion that Martin possessed reasonable suspicion to stop Manyvorn. At a suppression hearing, hearsay information is sufficient to support a fact or an opinion. *Castro v. State*, 227 S.W.3d 737, 743 (Tex. Crim. App. 2007) (citing *Granados v. State*, 85 S.W.3d 217 (Tex. Crim. App. 2002)). Although the officer who witnessed the

18

traffic violation may provide more specific details in support of his reason for conducting the stop, "in the case of offenses requiring only an objective determination of whether the offense was indeed committed, the court does not need to know the subjective details of the stop from the officer's standpoint in order to find that the stop was reasonable." *Castro*, 227 S.W.3d at 743.

An operator of a vehicle facing only a steady red signal is required to stop at a clearly marked stop line. Tex. Transp. Code Ann. § 544.007(d). Here, Martin's dash camera recording showed that Manyvorn failed to stop at the stop line in violation of Section 544.007(d). *Id.* Manyvorn's commission of the stop-line violation in Martin's view was a fact "available" to Martin prior to and at the time of Manyvorn's detention. *Crain*, 315 S.W.3d at 52–53. Godbold also confirmed that Martin's dash camera recording showed that Manyvorn had committed a traffic violation by failing to stop at the stop line. The dash camera recording shows that the stop-line violation occurred before Manyvorn yielded to Martin's show of authority, that is before the investigative stop or detention occurred. *See Crain*, 315 S.W.3d at 52–53 ("In deciding whether reasonable suspicion existed [to conduct an investigative detention], we look at the facts available to the officer at the time of the detention."). This evidence supports the conclusion that Martin possessed reasonable suspicion to stop Manyvorn's vehicle for the stop-line traffic violation, which was committed in his presence. Tex. Transp. Code Ann. § 544.007(d); *see Crain*, 315 S.W.3d at 52–53; *Ford*, 158 S.W.3d at 492.

19

Having viewed the trial court's findings of fact in the light most favorable to the ruling and its conclusions of law de novo and deferring to the trial court's determination of historical facts, we conclude the trial court did not err in denying Manyvorn's motion to suppress. *See Montanez*, 195 S.W.3d at 108–09; *Kelly*, 204 S.W.3d at 818–19. We overrule Manyvorn's sole issue on appeal.

## IV. CONCLUSION

Having overruled Manyvorn's sole issue on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 18, 2019